Ricardo De LEON, Appellant,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Appellee.**

No. 732, Docket 83–6272.

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1984.
Decided May 16, 1984.

Candace Scott Appleton, Nassau/Suffolk Law Services Committee, Inc., Bay Shore, N.Y. (Leonard S. Clark, Nassau/Suffolk Law Services Committee, Inc., Hempstead, N.Y., of counsel), for appellant.

Michael Cavanagh, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Robert L. Begleiter, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before LUMBARD, OAKES and CAR-DAMONE, Circuit Judges.

OAKES, Circuit Judge:

This is yet another case where the Government contends that a claimant's disability has ceased.[1] It involves an individual with a long history of severe mental problems, including paranoid schizophrenia, organic brain syndrome, and borderline intelligence, coupled with serious physical problems, including grand mal epilepsy and deformities due to congenital cerebral palsy. The appellant, Ricardo De Leon, has now been on and off the Social Security disability rolls twice. He first received benefits in 1977. These were terminated by the Secretary in 1978 and reinstated by a federal court in 1983.[2] He received benefits once again in 1979, was reevaluated as of June, 1981, and terminated a second time in August, 1981. An administrative law judge (ALJ) subsequently gave his case de novo consideration and, on December 30, 1981, found that De Leon was no longer under a disability. The ALJ's decision became the final decision of the Secretary when approved by the Appeals Council on June 15, 1982, a decision that was affirmed by the United States District Court for the Eastern District of New York, Leonard D. Wexler, Judge, after the usual referral to a magistrate.

We reverse. We do so because we find that the Secretary's decision to terminate was not supported by substantial evidence on the record as a whole, and that the Secretary failed to apply correct legal standards in evaluating the evidence of De Leon's disabilities.

## FACTS

Ricardo De Leon was born in Panama in 1951[3] with cerebral palsy, a condition which rendered him unable to walk until he was six years old. He has four problems which bear upon his ability to earn a living: a psychiatric disorder, a long history of epilepsy with organic brain syndrome, intelligence bordering on mental retardation, and physical problems and deformities. These conditions, then, must be evaluated under the Supplemental Security Income (SSI) statute[4] and regulations.[5]

1. More than 470,000 people have had their disability benefits terminated since March, 1981. In 160,000 of these cases, benefits were reinstated after appeal. An additional 120,000 appeals are still pending. N.Y. Times, March 24, 1984 at 1, col. 6. According to a spokesperson for the Social Security Administration, the agency was defending 34,400 disability lawsuits, including at least 95 class actions, as of the fall of 1983. Newsday, Oct. 3, 1983 at 13, col. 2.

2. *De Leon v. HHS*, No. 80–CV–191 (E.D.N.Y. May 20, 1983). De Leon had been awarded SSI benefits on the basis of his epilepsy: focal motor cortical seizures grand mal type. These benefits were terminated in August, 1978. De Leon successfully reapplied in November, 1979, asserting his conditions here. His benefits were again terminated before the decision on the first termination came down.

3. De Leon's age is subject to doubt. Although De Leon testified to being 23 years old, various medical records show him to be in his early 30s.

4. The statute, 42 U.S.C.A. § 1382c (1983), provides in part:
    (3)(A) An individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months (or, in the case of a child under the age of 18, if he suffers from any medically determinable physical or mental impairment of comparable severity).
    (B) For purposes of subparagraph (A), an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

5. *See* 20 C.F.R. § 416.920 (1983), which describes in general terms the steps the Secretary must follow in evaluating disability. *See generally Chico v. Schweiker*, 710 F.2d 947 (2d Cir. 1983).

*Evidence of Psychiatric Disorder*

De Leon has spent more than three years in mental institutions. Dr. Maria Uy, staff psychiatrist with Catholic Charities Community Life Center, a Long Island after-care agency that has been treating and assisting De Leon for years, diagnosed him as suffering from paranoid schizophrenia and organic brain syndrome due to epilepsy. In her report of April 8, 1981, Dr. Uy gave De Leon a "guarded" prognosis.[6] Similarly, the report of the Secretary's medical consultant, Dr. Anthony Correoso, dated June 8, 1981, includes observations that De Leon loses his temper easily, feels he cannot trust anyone, and is "suspicious," "surly," "at times hostile," "rambling," "angry," and "illogical." Dr. Correoso ultimately diagnosed De Leon as having a "mixed personality disorder."

In February, 1981, De Leon's case at Catholic Charities was closed because he had failed to keep clinic appointments and could not be located. In reporting the termination, Dr. P. Friedland, a psychiatrist, diagnosed De Leon as suffering from organic personality syndrome, a condition which usually involves structural damage to the brain, and which, according to the American Psychiatric Association, results in "[s]ocially unacceptable" and "[i]mplosive or explosive behavior" that is often "dangerous to the individual and to others." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 119–20 (3d ed. 1980).

Karl Dichtl, a Catholic Charities case manager, worked closely with De Leon from 1979 to 1981. He testified that De Leon frequently had "obsessions" and "rages," and had difficulty functioning even in a "sheltered work environment." For example, when assigned even a simple task like mopping the floor, De Leon became terribly angry at a staff member at the shelter who he claimed walked on wet floors and who was "playing a game" with him. Dichtl also related that De Leon had "disturbed personal relationships." At the time of the case worker's testimony, De Leon needed continual supervision.

De Leon's own testimony before the ALJ included accusations against his landlords, coworkers, and numerous other people with whom he came in contact. In addition, he made numerous accusations against his aunt, whom he holds responsible for his epilepsy and whom he evidently once tried to poison.

---

**6.** Dr. Uy's comments included the following: *Mental Status:*

Attitude and General Behavior is cooperative, friendly, short in stature and appears somewhat younger than stated age.

Stream of mental activity—overproductive, rambling, irrelevant at times with paranoid flavor in his ideations. He tends to confabulate and is quite grandiose.

Emotional reaction—mood is neutral, but affect is constricted.

Mental Trend and Content of Thought—He claims that he had not received his checks since 1/80 because the computer considered him dead and Catholic Charities had been giving him support. His former landlady kicked him out of the place because of non-payment and he said, "We had an argument and she started calling me names and I cursed her back". He used all dirty words to describe the landlady and the patient was smiling inappropriately.

Patient was noted to shift from one topic to another and he has to be brought back again and again to former questions asked. He is pre-occupied about how he was mistreated by father and aunt and said, "If I find where they live, I am going to kill them." He also described in detail how Kings Park Hospital abused him physically, claiming one nurse beat him on his back, etc.

Patient claims he has ESP and it comes out through his dreams. He talked about his dreams all violent in nature and he claims his co-boarders would fight each other the next day.

Denied hallucinations, alcoholism or drug abuse. He claims he had epilepsy following a trauma where he came home and saw his aunt was beating his grandmother, (all three lived together in New York) and he tried to stop her but the aunt hit him with an iron pipe and he fell. Since then he has had epilepsy. Last seizure was two weeks ago. He could not recall the date of the trauma. Denied suicidal ideations.

. . . .

Patient showed poor insight and judgment. In summary, it is quite obvious that we are dealing here with a psychotic male who is not fitted to be employed at this time but needs mental condition to be stabilized, besides his seizure problems.

*Epilepsy*

De Leon has a long, fully documented history of grand mal epileptic seizures resulting in his organic brain syndrome. These seizures frequently resulted in his personal injury, and it was for this disability that he was originally awarded Social Security payments in 1977 and again in 1979. At first he was treated with phenobarbitol and Dilantin, but those medications were ineffective in preventing seizures. His treating neurologist at Stony Brook University Hospital Health Services Center, where in 1980 he had been diagnosed as having "organic personality syndrome (paranoid ideation)," prescribed Tegretol. According to the *Physician's Desk Reference* 914 (35th ed. 1981), this drug is "not recommended as the drug of first choice in seizure disorders," but is "reserved for the patients whose seizures are difficult to control and/or patients experiencing marked side effects."

De Leon's testimony as to the effectiveness of the drug, for what it might be worth, was confusing. He said that "it seems to be controlling it," yet also admitted that he had had a seizure only two months before while taking the drug. Karl Dichtl, his longtime case manager, testified that De Leon had experienced numbness in his arms and memory loss, conditions which his neurologist characterized as side effects attributable to use of Tegretol. In addition, it is clear from the record that De Leon's epilepsy affects his psychiatric condition. His neurologist pointed out that the epilepsy had contributed to De Leon's "significant psychiatric disturbance with considerable paranoid ideation." At the administrative hearing, De Leon himself implied that his aunt caused his epilepsy.

*Borderline Intelligence*

As of June, 1981, De Leon's IQ on the full scale was 85 with a verbal score of 78 and a performance score of 97, placing him in the seventeenth percentile of intellectual abilities. A psychological report, prepared by Dr. Robert Schmeltz at the time of the IQ test, noted De Leon's "failure at having profitted [*sic*] from traditional educational experience" and "the presence of minimal brain dysfunction." The report evaluated De Leon as having a "borderline level of social comprehension."

*Physical Deformities*

De Leon has a number of physical deformities as a result of cerebral palsy. His left hand, which is his dominant hand, is "permanently frozen into a claw like position." Deformities of his ring and little fingers make movement of his left hand painful and severely limit his use of this hand. Despite surgical procedures, these problems persist. De Leon also has a weakening of his left lower limb, causing a discernable atrophy and leaving him with a marked limp. Additionally, although a posterior dislocation in the left shoulder was treated in 1974, De Leon's shoulder movement is still limited in all directions and there is considerable atrophy of the deltoid muscle. At all times De Leon declined to refer to his cerebral palsy, but claimed that his fingers, leg, and shoulder were merely "broken."

## DISCUSSION

*The Lack of Substantial Evidence*

Factual determinations of an administrative agency must be taken as conclusive by a reviewing court if there is substantial evidence on the record to support the agency's decision. 42 U.S.C. § 405(g) (1982). Substantial evidence means " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). In the case before us, the Secretary contends that none of De Leon's physical or psychiatric problems render him disabled. On review of the record, however, we conclude that there is no substantial evidence to support the Secretary's conclusion.

The ALJ determined that De Leon "does not have a severe mental or psychological

impairment" and thus does not qualify for benefits on account of such problems. He based these conclusions upon De Leon's own testimony that he did not have a mental disorder, did not receive psychotherapy, and did not take any psychotropic medication; the testimony of a nonexamining vocational consultant, Arthur I. Bierman; the report of the consulting psychiatrist, Dr. Correoso; and the appellant's demeanor and appearance at the hearing. Even taking full account of the notorious difficulties encountered in making accurate psychiatric diagnoses, however, the evidence that De Leon suffers from severe psychological and mental impairments is overwhelming. The appellant at least facially meets the listings in the regulations for chronic brain syndromes and functional psychotic disorders,[7] and the record does not contain substantial evidence to support the Secretary's contrary conclusion.

A claimant's denial of psychiatric disability or the refusal to obtain treatment for it is not necessarily probative. *See Cullison v. Califano*, 613 F.2d 55, 58 (4th Cir.1980). In De Leon's case, it is clear that a psychiatric impairment existed and that psychotherapy and medication were indicated and recommended. Indeed, even Dr. Correoso, the consulting psychiatrist upon whom the ALJ relied, diagnosed De Leon as having a "mixed personality disorder with epilepsy,"

and concluded that "he would do well to be involved in psychotherapy to help him deal more efficiently and effectively with people." Thus, neither De Leon's testimony with respect to his psychological condition, nor the fact that he was not currently receiving psychotherapy or taking psychotropic medication, provides substantial support for the Secretary's conclusion.

The Secretary's reliance on the testimony of the vocational consultant, Arthur Bierman, is similarly misplaced. Bierman himself made no examination of De Leon, but rather was presented with hypothetical questions posed by the ALJ.[8] Despite these circumstances, Bierman testified that De Leon's judgment was "not severely impaired," but fair. In so doing, the vocational consultant substituted his own opinion of De Leon's insight and judgment for those of other experts who were personally knowledgeable of appellant's condition.

■ The consultant's evaluation of De Leon's condition thus directly contradicted that of the claimant's consulting and treating physicians, and of the vocational rehabilitational counselor with whom he had worked closely for nine months. Vocational expert testimony alone does not provide the necessary substantial evidence from which to deduce a capacity to engage in substantial gainful activity when there is overwhelming evidence to the contrary in

---

7. 20 C.F.R.App. I, subpart P of Part 404, §§ 12.02 and 12.03 (1983) at page 300 provide:

12.02 *Chronic brain syndromes* (organic brain syndromes). With both A and B:

A. Demonstrated deterioration in intellectual functioning, manifested by persistence of one or more of the following clinical signs:

1. Marked memory defect for recent events; or

2. Impoverished, slowed, perseverative thinking, with confusion or disorientation; or

3. Labile, shallow, or coarse affect;

B. Resulting persistence of marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people.

12.03 *Functional psychotic disorders* (mood disorders, schizophrenias, paranoid states). With both A and B:

A. Manifested persistence of one or more of the following clinical signs:

1. Depression (or elation); or
2. Agitation; or
3. Psychomotor disturbances; or
4. Hallucinations or delusions; or
5. Autistic or other regressive behavior; or
6. Inappropriateness of affect; or
7. Illogical association of ideas;

B. Resulting persistence of marked restriction of daily activities and constriction of interests and seriously impaired ability to relate to other people.

8. The hypothetical questions put to Bierman had a number of serious defects. As we discuss, the ALJ failed to explain precisely De Leon's impairments. In addition, his questions recited incorrect, or at least nonprobative, vocational information, i.e., that De Leon was 23 years old, had a 12th grade education, and a past work experience as a maintenance man. *See Aubeuf v. Schweiker*, 649 F.2d at 114; *Tennant v. Schweiker*, 682 F.2d 707, 711 (8th Cir.1982).

the record. *See Yawitz v. Weinberger,* 498 F.2d 956, 961 (8th Cir.1974). We have such overwhelming evidence in this case, and thus the vocational expert's testimony cannot provide substantial evidence for the Secretary's finding.[9]

■ The testimony of Dr. Correoso, the ALJ's consulting psychiatrist, likewise does not provide substantial support for the Secretary's determination. Dr. Correoso found the claimant to be suspicious, surly, and at times hostile, rambling, illogical, and bitter. In the doctor's assessment, De Leon's insight was "poor," though his judgment was "fair" and he was oriented with a "good" fund of general knowledge. He diagnosed De Leon as having a mixed personality disorder with epilepsy. Clearly, Dr. Correoso's evaluation was not a sufficient basis for finding no disability.

Finally, insofar as the ALJ relied on factors such as De Leon's demeanor or appearance, such factors really do not contribute toward meeting the substantial evidence burden in cases of this nature. *See Aubeuf v. Schweiker,* 649 F.2d 107, 113 (2d Cir.1981). As we said in *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 41 n. 6 (2d Cir.1972), "[t]o receive benefits ... one need not be completely helpless or unable to function...." The applicant for disability need not be "a total 'basket case,'" *Timmerman v. Weinberger,* 510 F.2d 439, 442 (8th Cir.1975). However De Leon may have appeared at his hearing, we cannot ignore the overwhelming evidence that he has severe, disabling psychological and other problems.

The Secretary's disregard of the claim for disability based on epilepsy is similarly unsupported by substantial evidence. The ALJ found that De Leon did not have a severe neurological impairment because he had only one seizure in the last year and thus did not satisfy the numerical frequency test for neurological impairment relative to epilepsy under the regulations. Ignoring De Leon's testimony that he had had a seizure only two months before the hearing while taking Tegretol, the ALJ concluded that De Leon's epilepsy "is under total control with medication." The ALJ also made no mention of the testimony that De Leon was experiencing significant side effects from using Tegretol.[10] There is no substantial evidence on the record to support the ALJ's finding that De Leon's epilepsy is "under total control."

Moreover, there is no substantial evidence on the record to support the ALJ's findings with respect to De Leon's relatively low intelligence and physical afflictions. The ALJ essentially ignored the psychologist's findings that De Leon is of low intelligence and has a "borderline level of social comprehension." Although he summarized the psychologist's report in his decision, the ALJ did not test the report's conclusions by presenting them in hypothetical questions to the vocational consultant. For example, he failed to mention to the consultant that De Leon's intelligence bordered on mental retardation, and that he had organic brain syndrome. The ALJ concluded, nevertheless, that "[t]he claimant's capacity to exercise judgment, understand, carry out and remember instructions and respond appro-

9. Not only did Bierman improperly substitute his opinion for those of examining experts, he also impermissibly interpreted the opinion of Patricia Fogarty, De Leon's rehabilitation counselor. Fogarty testified that De Leon's "emotional instability precludes competitive employment at this time" and that his "view of work is distorted and confused," noting his difficulty in concentration, inability to request and accept supervision and his feeling threatened by authoritarian figures. After questioning Fogarty's objectivity because "they [meaning Catholic Charities] have a proprietary interest in keeping him," Bierman concluded that she had presented a positive profile of De Leon's insight and

judgment. While the vocational consultant's premises (as to Catholic Charities' bias) ultimately was stricken as improper, his conclusion, based on these premises, was nevertheless given great weight.

10. Interestingly, the *Physician's Desk Reference* warns that "the drug should be stopped if any evidence of bone marrow depression develops." *Id.* at 914. While it is not referred to in the briefs, records or testimony, the court notes that De Leon's neurologist noted on June 3, 1980, "demineralization Bone—Metabolic [unintelligible.]"

priately to supervision, co-workers and customary work pressures is not significantly limited." Surely a borderline IQ has a bearing on employability, even as a mop-pusher, porter, or maintenance man.[11]

We are also concerned with the ALJ's evaluation of De Leon's physical impairments. To be sure, De Leon's physical ailments alone do not meet or equal the listings. Nevertheless, they are severe and definitely affect De Leon's residual functional capacity to perform work even of the variety mentioned. *See generally Lewis v. Weinberger*, 541 F.2d 417, 420 (4th Cir. 1976). In positing hypothetical questions to the vocational consultant, however, the ALJ did not even present the full extent of De Leon's physical disabilities. He made no mention, for example, of De Leon's shoulder or leg problems, or the full implications of his epilepsy. As a result, the record provides no basis for drawing conclusions about whether De Leon's physical impairments or low intelligence render him disabled.

In sum, the Secretary's finding that De Leon is not disabled is not supported by substantial evidence on the record before us.

*Improper Application of Legal Standards*

We are also concerned that the ALJ made serious errors in applying the relevant legal standards to the facts of this case. In particular, we find that the ALJ failed to apply the medical improvement standard, to consider the combination of De Leon's impairments, or to give proper weight to the testimony of the treating physician. Each of these errors also constitute an adequate ground for reversal.

■ 1. *Medical Improvement Standard.* The question whether the Secretary has to apply the medical improvement standard in terminating benefits to a person who, like De Leon, was previously found to be disabled was left open by this court in *Delamater v. Schweiker*, 721 F.2d 50 (2d Cir.1983) (per curiam), and *Schauer v. Schweiker*, 675 F.2d 55 (2d Cir.1982). Under this standard, the Secretary may terminate benefits to a person previously adjudged to be disabled only upon substantial evidence that the individual's condition has improved to the point that he or she is no longer disabled, or that the initial finding of disability was erroneous. The Secretary's position has been that benefits may be terminated based only on substantial evidence that the claimant is not currently disabled, without regard to whether there has been demonstrable medical improvement in the claimant's condition.[12] We do not believe that the Secretary's position is authorized by the Social Security statute, or even consistent with her own regulations.

The Secretary is authorized to terminate a claimant's disability benefits whenever she obtains evidence that a claimant's disability has "ceased." 42 U.S.C.A. § 425(a) (1983). Although the statute does not specifically propound a standard for terminating benefits, its reference to a disability "ceas[ing]" suggests that the Congress intended the Secretary to compare an applicant's condition at the time of review with his or her condition at the time benefits were initially granted. Likewise, the regulations promulgated under the statute speak of whether a claimant's disability "continues" or "has ended." 20 C.F.R. §§ 404.1590(a) and 404.1594(a) (1983). The

---

11. In fairness to the ALJ, a reading of De Leon's testimony discloses a kind of canny awareness that may have misled the ALJ as to his intellectual abilities. For example:

Q. Do you bleed profusely from any parts of your body?
A. All depend if I cut myself.
Q. How many hours a night do you sleep?
A. All depends when I go to bed.

12. The Secretary used the medical improvement standard prior to 1976. The change to the cur-

rent disability standard, announced in commentary to the 1980 regulations, 45 Fed.Reg. 55,568 (1980), was not mandated by any change in the statute or regulations.

We note that Secretary Heckler recently announced the suspension of periodic reviews of eligibility for disability benefits, pending congressional actions on legislation to clarify the review process and applicable standards. N.Y. Times, Apr. 14, 1984, at 1, col. 2.

clear implication of both the statute and the regulations, then, is that a comparative standard should be employed in deciding whether to terminate an individual's benefits. If the claimant's condition improves to the point where he or she is able to engage in substantial activity, benefits are no longer justified, and may be terminated by the Secretary.

The view that the Secretary may simply disregard a prior finding that a particular medical condition is disabling is inconsistent with the case law in other circuits. *Kuzmin v. Schweiker,* 714 F.2d 1233 (3d Cir.1983); *Simpson v. Schweiker,* 691 F.2d 966 (11th Cir.1982); *Weber v. Harris,* 640 F.2d 176 (8th Cir.1981); *Cassiday v. Schweiker,* 663 F.2d 745 (7th Cir.1981); *Hayes v. Secretary of Health, Education and Welfare,* 656 F.2d 204 (6th Cir.1981); *Finnegan v. Matthews,* 641 F.2d 1340 (9th Cir.1981); *Miranda v. Secretary of Health, Education and Welfare,* 514 F.2d 996 (1st Cir.1975); *Rivas v. Weinberger,* 475 F.2d 255 (5th Cir.1973). These cases stand for the proposition that, having once established that a particular condition is disabling, a claimant is entitled to a presumption that as long as there is no change in the condition itself, or in the governing statutes or regulations, neither will the statutory classification of disability be changed. As the Third Circuit explained:

> Basic principles of fairness as well as the need to provide both the appearance and fact of consistency in the administrative process lead us to conclude that in a termination proceeding, once the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling. Such a presumption will help avoid the disconcerting picture presented by the triple administrative flip-flop in this case.

*Kuzmin,* 714 F.2d at 1237. Because we agree that benefits may not be terminated "simply on the whim of a changed ALJ," *Simpson v. Schweiker,* 691 F.2d at 969, we hold that the Secretary must apply the medical improvement standard in deciding whether to terminate benefits to an individual previously found to be disabled.

In the case before us, all the evidence pertains to medical factors, and there was evidence of only one medical difference between De Leon's condition at the time of the hearing below and the time he was initially granted benefits, namely the introduction of the medication Tegretol for his epilepsy. Use of the drug has apparently resulted in a decrease in the number of De Leon's seizures. The court below concluded summarily, however, that "in any case, a medical improvement has been demonstrated here by plaintiff's testimony that his epilepsy is now under control." There was absolutely no further comparison between De Leon's condition at the time he was initially found to be disabled and his condition at the time of the hearing below, either by the ALJ or Judge Wexler. Clearly, this comparison of evidence was grossly inadequate and does not provide substantial support for finding the requisite medical improvement.

2. *Combination of Impairments.* It is the clear rule in this circuit that "all complaints … must be considered together in determining … work capacity." *Gold v. Secretary,* 463 F.2d at 42 (quoting *Burns v. Celebrezze,* 234 F.Supp. 1019, 1020 (W.D.N.C.1964)); *see also Cutler v. Weinberger,* 516 F.2d 1282, 1285 (2d Cir. 1975). Here we have a record of four separate and distinct impairments. Neither the ALJ nor the Secretary, however, analyzed these impairments in combination. For this reason, too, we reverse the decision below.

3. *Testimony of Treating Experts.* The cases in this circuit are almost legion where the court has reversed administrative findings due to the factfinder's failure to give appropriate weight to the expert opinion of the treating physician. *E.g., Aubeuf,* 649 F.2d at 112 (quoting *McLaughlin v. Secretary of Health, Education & Welfare,* 612 F.2d 701, 705 (2d Cir.1980)), quoting *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir.1978). Once again, we find that the

Secretary failed to give sufficient weight to the evidence of the treating mental health professionals and gave no justification for not doing so. *See Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.1981).

In De Leon's case, the ALJ was presented with abundant testimony by treating experts. Dr. Maria Uy, who treated De Leon over a number of years and thus was intimately familiar with his case and its course, found that De Leon "showed poor insight and judgment" and was "not fitted to be employed at this time." Likewise, the testimony of Karl Dichtl, De Leon's case manager, and Patricia Fogarty, his rehabilitation counselor, reached the same conclusions about De Leon's ability to work. Irrespective of the ALJ's recital of boilerplate, he relied solely on the evidence presented by the consulting physician and vocational counselor in finding De Leon not disabled, and thus failed to give the required weight to the views of experts treating De Leon.

## CONCLUSION

We reverse the judgment, reinstating De Leon as eligible for benefits retroactive to the date of termination, August 19, 1981, and direct the district court to award reasonable attorney's fees under the Equal Access to Justice Act.

Judgment reversed.