**Mandeville FROST, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

No. 82 Civ. 4394 (IBC).

United States District Court, S.D. New York.

June 19, 1984.

Davison F. Moore, Poughkeepsie, N.Y., for plaintiff.

Rudolph W. Giuliani, U.S. Atty. for the Southern District of New York, New York City, for defendant.

Stephen A. Dvorkin, Asst. U.S. Atty., New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff, Mandeville Frost, seeks review of the decision of the Secretary of Health and Human Services terminating his disability insurance benefits following a most debilitating accident, as provided by Social Security Act §§ 216(i) and 223, 42 U.S.C. §§ 416(i) and 423. After fully exhausting his administrative remedies, including a hearing before an Administrative Law Judge (ALJ) and an additional adverse decision by the Appeals Council, plaintiff brought this action before us under section 205(g) of the Act, 42 U.S.C. § 405(g), seeking judicial review of the Secretary's determination. Both parties now move for judgment on the pleadings.

*The Facts*

The following pertinent evidence was adduced from the transcript of the administrative record in this case.

Plaintiff was born on January 1, 1938, and was 43 years of age at the time of the 1981 hearing. He attended Princeton University while on a baseball scholarship, majoring in English. He went on to the University of Virginia Law School, wrote for one of the legal publications, and following graduation he was hired as an associate by Robert Marvin, Esquire. From 1965 until 1979, he practiced law in upstate Rhinebeck, New York; Mr. Marvin made him a full partner in the firm in 1978. Although he specialized primarily in real estate and zoning matters, plaintiff also engaged in some litigation and estate work. According to all accounts, a picture was painted of an exceptionally gifted and talented young man with a happy home life.

His friend, the man who made him partner, Robert Marvin, stated at the hearing that plaintiff had been "a very brilliant scholarly lawyer with excellent background and training" and was "an extremely articulate young man" before the accident. Plaintiff's fine reputation is further reflected in psychologist Dr. David Crenshaw's description of plaintiff as "a prominent and highly regarded attorney in this small [Rhinebeck] community ... well known and highly respected ... [h]e was also well known in this community for being an exceptional athlete, and therefore possessing, in addition to his intellectual gifts, tremendous physical skills as well."

Indeed, the record is replete with references to his pre-accident physical prowess and exceptional coordination—he was the number one top seeded tennis player for his age at the nearby Poughkeepsie tennis club; he skied avidly; and he was also an excellent trout fisherman. In summary, he was the all-around sportsman. It appears that he additionally enjoyed the blessing of a happy marriage and was the father of three young children who were about 16, 15 and 8 years of age at the time of the hearing. The Frost family lived on about ten acres of land, the residence occupying approximately two acres.

This storybook lifestyle altered abruptly at 1:30 a.m. on May 26, 1979 when plaintiff was involved in a tragic auto accident over the Memorial Day weekend. Rushed to the emergency room at Northern Dutchess Hospital with multiple severe injuries including advanced respiratory distress, plaintiff suffered laceration of the liver and the hepatic artery and vein, a herniated

diaphragm, ruptured bowel and spleen, traumatic encephalopathy (head injuries), and a cardiac arrest followed by an anoxic brain episode (absence of oxygen to the brain). The ensuing hospital course included surgeries extending until July 6, 1979, when plaintiff was discharged and transferred for rehabilitation to the Burke Rehabilitation Center in White Plains, New York.

Upon admission to the Center, he was examined by Dr. Walter Reichert, the neurologist in charge of the Head Trauma Service, who found plaintiff to have status post closed head injuries, multiple internal injuries and post-surgical repair of same, and a history of hypertension secondary to cardiac arrest and hemorraghic shock resulting from the anoxic brain episode. Following this diagnosis, Dr. Reichert recommended a finding of disability under the Social Security law.

Plaintiff filed for disability benefits on August 8, 1979. After being examined for the Social Security Administration (SSA) by a review physician, who stated in his written evaluation of August 20, 1979 that "[c]laimant will be disabled for at least one year," plaintiff's application was granted. Thereafter, he received $996 a month in disability insurance benefits.

The SSA, through the Bureau of Disability Determinations of the State of New York (the Bureau) undertook periodic reviews of his condition pursuant to their internal policy. On June 9, 1980, the Bureau notified plaintiff they had determined that his eligibility for disability benefits had ceased as of March, 1980. Upon reconsideration, the Bureau affirmed this initial determination but extended his eligibility to May 31, 1980 by a letter dated November 24, 1980.

Approximately a year later, an administrative hearing was held before ALJ Arthur E. Neubauer on November 4, 1981. Plaintiff was represented by counsel, Mr. Marvin, his friend and former law partner. The ALJ considered the case *de novo*, heard the testimony of both the plaintiff and his attorney, and reviewed the medical reports filed by treating and nontreating physicians, including neurologists, psychiatrists, psychologists, and neuropsychologists.

Plaintiff testified on his own behalf that he received memory training and psychological treatment from both Dr. Richard Kovner and Dr. Steven Mattis, neuropsychologists at Montefiore Hospital in New York City. He complained of continuing problems with his balance, his handwriting disability, his failure to remember appointments or directions or where he had parked his car. Although plaintiff felt he could walk normally, if someone brushed up against him he would "tip over." Questioned about his physical status, plaintiff responded that he could drive with the directions tacked up in the windshield, and that he could "rak[e] leaves and [do] stuff around the house as best I can, but, you know, that's a trouble. I can't seem to keep my mower going." He later expanded that he had mowed the lawn on a rider mower which had tipped over on one occasion. Once a week, he would attempt to hit tennis balls over the net with the aid of a tennis pro at the tennis club where he had once been top seed; apparently, this was a form of therapy as he was unable to consistently get the balls over the net.

He engaged in some mental exercise by virtue of a volunteer project suggested by his former partner, Mr. Marvin: three days a week he would drive to a local title company where he would re-trace a real estate title search. These searches were previously done by title company employees, and in stark contrast to his pre-accident search of three or four hours, one search would now take him eight or ten hours.

At one point, the ALJ also questioned plaintiff about his job capabilities, inquiring as to what prevented him from getting more active in the practice of law. Plaintiff responded, "Confusion that's the thing that basically is the problem in my life right now. I'm confused a lot of the time." The ALJ next asked whether he was considering any other kind of work besides the practice of law. Plaintiff stated: "Well,

yes, sure, I consider them. But to be honest with you, I get so depressed when I think about anything else besides practicing law that I just can't even function right."

Mr. Marvin's testimony consisted largely of commentary on plaintiff's past and present capabilities and his financial status. He reported that plaintiff was receiving certain partnership income for the year 1978–79, approximately $1700 from two accident policies, $800 a month in no-fault insurance payments (up to a $50,000 limit), and unspecified income from oil and gas tax shelters.

The medical evidence consisted solely of written evaluations and letters by both treating and non-treating physicians; no oral testimony was presented. We have summarized the medical evidence in chronological order for the sake of clarity.

On March 19, 1980, Dr. Walter Reichert, the neurologist at the Burke Rehabilitation Center who had originally examined plaintiff upon his admission there, wrote that he had examined plaintiff and found continued decreased memory, coordination and motor skills; and that he was not on any medication. The doctor checked off several boxes on a standard form to indicate that plaintiff could frequently lift or carry over 50 pounds; could use his hands for repetitive actions such as grasping, pushing and pulling; could use his hands for fine manipulations; and could follow simple commands. Although his report does not indicate alternative employment possibilities, he stated that plaintiff was not able to return to his previous employment.

Based largely on Dr. Reichert's report, Dr. Hahn, an internist and consultant for the SSA, stated that plaintiff could do medium work not entailing exposure to heights or machinery considering his physical status only.

In contrast, a letter dated December 26, 1980 from plaintiff's treating neuropsychologist, Dr. Richard Kovner, stated that "no significant progress has been noted in [his] ability to store and retrieve new information. [This inability] prevents him from doing any work, high-level or low-level, in which a sequence of steps is necessary ... Additionally, his self-esteem has been severely damaged by his awareness of his memory and intellectual deficits. *Requiring him to seek employment at an entry level position will confirm his inadequacies, and precipitate an abrupt, reactive, severe depression with suicidal potential.*" (emphasis ours)

On December 29, 1980, Dr. Volpe, his treating neurologist, reported that plaintiff had "dense anterograde amnesia" and muscle tone and posture abnormalities underlying motor coordination for walking and hand activity. In this neurologist's opinion, plaintiff "should be considered totally disabled to practice law, and [Dr. Volpe] would be very cautious in suggesting other work for him in the future."

The ALJ also considered a letter written by a clinical neuropsychologist associated with Dr. Kovner, Dr. Steven Mattis. Dr. Mattis, who also treated plaintiff, wrote on March 2, 1981 that plaintiff could not retain enough information to enable him to function at any sort of mentally demanding work. In his opinion, *"to make [plaintiff] engage in less mentally demanding work, would run the risk of producing an explosive depressive response from him,"* and that *"suicide could be the result of such a reaction."* (emphasis ours)

On March 9, 1981, psychologist Dr. David Crenshaw, who had previously known plaintiff in their small community, performed a psychological examination. After extolling plaintiff's exceptional reputation as a "highly gifted attorney" and "exceptional athlete" prior to the accident, he wrote that plaintiff suffered from "significant problems with memory, balance and stilted speech"; that his eyes were "fixed in a rather rigid stare"; that his motor movements seemed "to be very rigid and poorly coordinated"; and that he became "highly frustrated" on each of the visual motor tasks that he was asked to perform during the examination.

The SSA then had Dr. William Johnston, a psychiatrist, examine plaintiff at his home in Rhinebeck on May 7, 1981. Some of his observations are summarized as follows: "He's a tall man with suggestion of vacancy in his eyes. I am surprised by the weight that he gave [160–162 down from 175]. He appeared to me to be thin and fragile. He does not present the appearance of vigorous, good health ... On each occasion that he got up from the chair he started off with unsteadiness. As he returned, his gait was more stable ..." Dr. Johnston further stated that plaintiff showed a mild speech defect; that he lacked animation and recognized his deficiencies; that memory was a problem for him; and suggested a diagnosis of organic affective syndrome with organic personality syndrome due to brain damage. He also quoted plaintiff as stating, "[I]f I can't go into law, I don't know what I could do."

On May 22, 1981, Dr. M.J. Tissenbaum, a review physician for the Bureau, who was a psychiatrist and a neurologist, stated that plaintiff had the residual functional capacity for non-stressful work, based upon the evidence in the file.

The final piece of medical evidence considered by the ALJ was a letter written to counsel on November 4, 1981 by Dr. Kenneth Appell, the surgeon who had initially treated the plaintiff following the accident. In a brief statement, Dr. Appell wrote that the plaintiff would be unable to return to gainful employment for another 12 months.

In a thoughtful and well-written decision dated January 27, 1982, the ALJ concluded that plaintiff's eligibility for benefits had ceased as of September, 1980. He reasoned that the plaintiff was "not now disabled within the meaning of the [Social Security] Act ... [although] rather evidently, and as claimant testified, he still experiences deficits from his severe injuries"; and found that he had the "physical and mental capability to engage in work of at least medium exertion" not involving heights or machinery and "notwithstanding his decrease in memory"—all based upon his assessment of the medical evidence.

The ALJ further concluded that he could "not accept the statement of Dr. Appell that the claimant cannot engage in any gainful employment, noting that it is not supported by any clinical details, and is inconsistent with claimant's daily activities."

As for the opinions of the treating experts, the ALJ afforded little weight to their opinions as to potential psychological effects or consequences, as is reflected in his decision: "The psychologists he presently is seeing have reported the risk of dire emotional consequences if attempt is made to require the claimant to engage in less mentally demanding work. However the fact that the claimant is denied continued ... benefits does not mean that he is required to engage in lesser work, particularly considering his current income even without Social Security benefits. It simply means that he no longer is prevented from engaging in some kind of substantial gainful work, regardless of how menial it might be. Further, regarding a statement in his psychologist's most recent report that the claimant has significant agitated depression and anxiety, this was not shown in the psychiatric examination [apparently, by Dr. Johnston] and is inconsistent with the nature and extent of his daily activities, and accordingly I cannot find it of such severity as to prevent work activity."

After reviewing the ALJ's decision, the Appeals Council amended it only to reflect cessation of the plaintiff's disability as of November, 1980 (thereby extending his benefits two months) but affirmed it in all other respects. This became the final decision of the Secretary on June 4, 1982.

*Discussion*

In the instant case, the sole issue is whether the plaintiff's eligibility for disability benefits was improperly terminated by the Secretary, based upon the determination that plaintiff's disability had ceased.

Section 223(d)(1) of the Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Section 223(d)(2)(A) further provides that "an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work..."

■ Once evidence has been presented to support a finding that a given condition of disability exists, the general rule adhered to by this Court is that the condition has remained unchanged. *See Delamater v. Schweiker*, 721 F.2d 50 (2d Cir.1983); *Simpson v. Schweiker*, 691 F.2d 966 (11th Cir.1982) (citing *Rivas v. Weinberger*, 475 F.2d 255 (5th Cir.1973)). The Secretary, however, may terminate disability benefits whenever presented with evidence that a claimant's disability has ceased. 42 U.S.C. § 425; 20 C.F.R. § 404.1590(a) and 404.-1594(a).

■ It is clear that a final decision of the Secretary will be sustained if it is supported by "substantial evidence" on the record as a whole. *See Cutler v. Weinberger*, 516 F.2d 1282 (2d Cir.1975). Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

■ In order to determine whether there is substantial evidence to support the Secretary's conclusion, we must apply the correct legal standards to the facts of the instant case in evaluating the evidence of plaintiff's disabilities. *See De Leon v. Secretary*, 734 F.2d 930, 936 (2d Cir.1984). These standards are: (1) the medical improvement standard; (2) the combination of impairments standard; and (3) the testimony of treating experts standard. *De Leon, supra.*

Under the medical improvement standard, the proper inquiry is whether the Secretary's finding of improvement—to the point of no disability—is supported by substantial evidence. *See Simpson, supra.* The underlying rationale for this is the principle of *res judicata;* as cogently explained elsewhere, "if a termination of benefits were effected without a showing either of improvement or newly discovered evidence, such a termination would of necessity be based on whim or caprice or would constitute an impermissible relitigation of facts and determinations already finally decided." *Shaw v. Schweiker*, 536 F.Supp. 79, 83 (E.D.Pa.1982). Furthermore, we must find that there was adequate comparison of evidence between plaintiff's condition at the time he was initially found to be disabled and his condition at the time of the administrative hearing, in order to provide substantial support for finding the requisite medical improvement. *De Leon, supra*, at 937. In addition, once a claimant meets his burden under 42 U.S.C. § 423(d) of showing that his physical impairment is severe enough to preclude a return to his former employment, the burden shifts to the Secretary to show the existence of "alternative substantial gainful work" consistent with plaintiff's physical capability, age, education, experience, and training. *See Ghazibayat v. Schweiker*, 554 F.Supp. 1005 (S.D.N.Y.1983).

In the case before us, the administrative record shows that the ALJ did compare plaintiff's condition at the time he was initially found to be disabled and his condition at the time of the hearing below. Both the medical evidence and plaintiff's testimony reflect that, to some degree, he could lift, exercise, mow the lawn, rake leaves, and drive an automobile. In other words, despite some lingering infirmity, plaintiff could "get around." Based upon this evidence, the ALJ concluded that medical improvement had been demonstrated to warrant a finding of "no disability."

While we support the proposition that an injured man, once recovered, should do what he can perform, we find that the ALJ

failed to take into account the organic brain syndrome and consequent psychological impairments which the evidence overwhelmingly demonstrates plaintiff suffered from at the time of the hearing below. Consequently, we conclude that the ALJ failed to apply the combination of impairments standard, or the testimony of treating experts standard; each of these errors constitute adequate grounds for reversal. *De Leon, supra.*

Under the combination of impairments standard, "all complaints ... must be considered together in determining ... work capacity." *De Leon, supra* (citing *Gold v. Secretary,* 463 F.2d 38, 42 (2d Cir.1972)). In the instant case, it is undisputed that plaintiff suffers from a severe organic brain syndrome [1] resulting from head injuries incurred in the accident.

In addition to this impairment, there is evidence from his treating physicians that plaintiff suffers understandably from frustration over his current state, and that requiring him to seek an entry level position might provoke an "abrupt, reactive, severe depression with suicidal potential." (Tr. 173, Dr. Richard Kovner) While we are cognizant of the notorious difficulties encountered in making accurate psychiatric diagnoses, we are compelled to the conclusion that plaintiff's lingering motor damage, in combination with the memory problems associated with his organic brain syndrome and the purported psychological disorder with possible tragic consequences, warrants a reversal of the decision below.

Finally, we find that the ALJ failed to give proper weight to the expert opinions of the treating physicians. *See Aubeuf v. Schweiker,* 649 F.2d 107 (2d Cir.1981). He was unimpressed by the opinions of plaintiff's treating physicians and found that plaintiff's psychological impairment was not "of such severity as to prevent work activity." He also afforded little weight to the opinion of the treating surgeon, Dr. Appell, whose recommendation was that plaintiff be considered as disabled for another year. We find that the ALJ relied primarily upon his own observations of plaintiff, and on the evidence presented by the non-treating physicians who were consultants for the SSA. Thus, he failed to give the required weight to the views of the experts treating the plaintiff. This too warrants our disagreement with the decision below.

■ We stress that we would uphold the finding below if not for its drastic adverse effect (possibly irremediable) upon the plaintiff; the fact that he could arguably perform some menial tasks leaves unanswered: at what price?

Proper application of the relevant legal standards to the facts of this case mandates our conclusion that the Secretary's finding that plaintiff is not disabled is not supported by substantial evidence on the record before us.

*Conclusion*

Accordingly, the determination by the Secretary is reversed. Further, we direct that a reappraisal of the claimant's benefits be made consistent with this opinion.

SO ORDERED.

---

1. 20 CFR App. I, subpart P of Part 404, § 12.02 (1983) provides: 12.02 *Chronic brain syndromes* (organic brain syndromes) ... A. Demonstrated deterioration in intellectual functioning, manifested by persistence of one or more of the following clinical signs: 1. Marked memory defect for recent events; or 2. Impoverished, slowed, perseverative thinking, with confusion or disorientation; or 3. Labile, shallow, or coarse affect; B. Resulting persistence of marked restriction of daily activities and constriction of interests ...