**Daniel L. LEWIS, Plaintiff-Appellant,**

v.

**Otis R. BOWEN, Secretary, Department of Health and Human Services, Defendant-Appellee.**

No. 86–1187.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1987.

Decided July 20, 1987.

Susan Hedy Hewman, Washington, D.C., for appellant.

Paul Steven Cega, Asst. Regional Counsel, Office of General Counsel, Dept. of Health & Human Services (Beverly Dennis, III, Chief Counsel, Region III, Charlotte Hardnett, Supervisory Asst., Washington, D.C., Michael W. Carey, U.S. Atty., Marye L. Wright, Asst. U.S. Atty., Charleston, W. Va., on brief), for appellee.

Before WIDENER and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

SPROUSE, Circuit Judge:

Daniel L. Lewis appeals from the order of the district court affirming the Secretary's denial of his claim for disability benefits under Title II of the Social Security Act.[1]  42 U.S.C. §§ 416(i), 423(d).  Lewis contends that the Secretary's determination that he did not meet or equal a listing in Appendix 1 to Subpart P of the regulations, 20 C.F.R. Part 404, Subpt. P, App. 1, was not supported by substantial evidence.  We agree and remand for the award of disability benefits.

### I.

On July 25, 1980, at the age of twenty-five, Lewis suffered a subarachnoid hemor-

---

1. Lewis applied for and was denied both disability benefits and supplemental security income. He appeals only the denial of disability benefits.

rhage with internal carotid artery aneurysm and posterior communicating artery aneurysm. He underwent a craniotomy with clipping of the internal carotid artery aneurysm and wrapping of the posterior communicating artery aneurysm.[2] Lewis was discharged from the hospital one month later.

It is uncontradicted that Lewis has suffered severe residual effects from the aneurysms and surgery. Before the surgery, his intelligence quotient (I.Q.) was 104, as reflected on his high school transcript. In January 1984, however, he was tested as having a performance I.Q. of 84, a verbal I.Q. of 78, and a full scale I.Q. of 78—a drop of 26 points. An I.Q. of 78 is considered to be in the borderline range of intelligence. Lewis also suffers from weakness and numbness in his right upper extremity and has trouble with fine or rapid movements of his right fingers. He also complains of recurrent dizziness and headaches.

Prior to the aneurysms and consequent surgery, Lewis had worked as a welder in shipyards, a mechanic in a cannery, a laborer for a coal company, and a flagman. He worked a sufficient period of time to qualify for social security disability insurance. Lewis has not worked since his surgery, except for a two-week period at a local pool hall. The owner fired him because Lewis could not lift kegs or cases of beer or use a broom and mop to clean.

Lewis received disability benefits from July 22, 1980 until April 1982, when the Secretary determined that he was no longer disabled. He did not appeal the termination. On August 16, 1983, however, Lewis filed a new application for disability benefits, alleging he had been disabled since July 1980. The application was denied initially and upon reconsideration. Lewis then requested a hearing before an administrative law judge (ALJ), who held a hearing on February 15, 1984.

The evidence presented at the hearing consisted of testimony by Lewis and his mother and medical evidence. The medical evidence consisted of Lewis' hospital records relating to the aneurysms and surgery; a report from Dr. John D. Varner dated March 10, 1981, noting considerable apraxia of the right hand; a report from Dr. Sayed Rasheed dated April 9, 1982, noting an improvement in speech and continued weakness in the right arm; progress notes from Lewis' treating physician, Dr. David P. Allen, D.O., covering August 1976 to July 1982; a report from Dr. Johnny T. Dy based on a September 1983 neurological examination; and a report from Dr. G. Lane Wagaman, a psychologist, based on an extensive neuropsychological examination performed on January 20, 1984. Following the hearing, the ALJ submitted the reports from Dr. Dy and Dr. Wagaman along with written interrogatories to a vocational expert, Dr. Arthur Ballas, for evaluation and responses to the interrogatories.

In determining that Lewis was not disabled, the ALJ relied on the reports of Dr. Dy and Dr. Wagaman—the only medical evidence covering the period following the termination of disability benefits—as well as the vocational expert's responses to interrogatories and the testimony at the hearing. The ALJ found that Lewis

> has severe residual effects [from the aneurysms and surgery], ... with continuing residual right upper extremity weakness, mild upper right extremity numbness, impaired intellectual functioning (borderline range of intellectual functioning with a verbal IQ of 78, performance IQ of 84 and a full scale IQ of 78) and other intellectual limitations, and emotional instability, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

The ALJ continued his sequential analysis and found that, although Lewis could not

---

**2.** A "subarachnoid hemorrhage" is an intracranial hemorrhage into the subarachnoid space. *Dorland's Illustrated Medical Dictionary* 700 (25th ed.). An "aneurysm" is a sac formed by the dilatation of an artery wall. *Id.* at 88. The "internal carotid artery" is the principal artery of the neck and supplies blood to the head. The "posterior communicating artery" is an artery within the brain that joins two cerebral arteries.

perform his past work, he had the residual functional capacity to perform "light work except for work involving sustained manipulative activity of the right hand or arm, skilled work activity and work activity in an emotionally stressful environment." The ALJ determined that Lewis was capable of performing certain jobs, specifically noting those of a "security guard, a watchman, a self-service station or parking lot attendant, a cashier, a janitor and a kitchen worker." The ALJ concluded that Lewis was not suffering from a disability as defined in the Social Security Act at any time following the prior termination of benefits through the date of his decision.

On August 31, 1984, the Appeals Council denied Lewis' request for review of the ALJ's decision. Lewis then appealed the Secretary's denial of benefits to the United States District Court for the Southern District of West Virginia. The court adopted the recommendation of the magistrate and granted summary judgment for the Secretary, affirming the denial of benefits. We conclude that there is not substantial evidence supporting the Secretary's determination that Lewis did not meet or equal a medical impairment listing.[3] We therefore reverse and remand for the award of disability benefits.

## II.

It is, of course, uncontradicted that Lewis suffered serious impairment from the combination of the aneurysms and subsequent surgery. The ALJ found, and the evidence supports, that their residual effects continue to affect Lewis. The Secretary concedes that if Lewis' impairment meets or equals the criteria of Listing § 12.02, he would be eligible for disability benefits. 20 C.F.R. § 404.1520(d). Listing § 12.02, as in effect at the time of the Secretary's final decision, provided:

12.02 *Chronic brain syndromes* (organic brain syndromes). With both A and B:

A. Demonstrated deterioration in intellectual functioning, manifested by persistence of one or more of the following clinical signs:

1. Marked memory defect for recent events; or

2. Impoverished, slowed, perseverative thinking, with confusion or disorientation; or

3. Labile, shallow, or coarse affect;

B. Resulting persistence of marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people.

20 C.F.R. Part 404, Subpt. P, App. 1 (1984).

The ALJ never discussed Lewis' medical impairment in relation to Listing § 12.02 or any other specific listing. He simply found that Lewis' condition did not meet or equal any listing. The ALJ stated, however, that Lewis had "documented ... certain intellectual and emotional impairments" and found that he had "impaired intellectual functioning," noting his reduced I.Q., and "other intellectual limitations."

On appeal to the district court, the magistrate analyzed Lewis' condition in relation to Listing § 12.02. He noted that "Dr. G. Lane Wagaman's finding of markedly diminished facility for short-term memory and auditory recall clearly satisfies the first prong of § 12.02." The Secretary concedes in his brief that "there is some evidence in the record supporting the contention that [Lewis] may meet section 12.02A, in that he has apparently had some deterioration in his intellectual functioning and a diminished capacity in immediate auditory recall and short term memory...." It is clear that substantial evidence does not support a finding that Lewis' condition did not meet § 12.02A.

---

**3.** Lewis also contends that his combined exertional and non-exertional impairments render him totally disabled and that the vocational expert, Dr. Ballas, failed to assess his work potential accurately. He argues, therefore, that substantial evidence does not support the Secretary's conclusion that he can perform light work with certain exceptions. We need not address these contentions since we conclude that substantial evidence does not support the Secretary's finding that Lewis did not meet a listing.

The major point of contention between the parties is whether Lewis meets the four requirements of § 12.02B. Although the discrete evidence presented at the hearing applies to more than one criterion of § 12.02B, we consider each criterion separately to determine whether substantial evidence supports a finding that Lewis' impairment did not meet or equal it.

The Secretary first contends there was no "marked restriction of daily activities" because Lewis testified that he visits friends, watches television, goes to movies and ball games, holds a drivers license, and visits the local pool hall. The Secretary asserts these are the same activities that Dr. Wagaman reported Lewis enjoyed prior to the aneurysms. The Secretary argues that substantial evidence therefore supports a finding that Lewis did not meet § 12.02B. We disagree.

It is true that Lewis testified he watches television and visits friends and the pool hall. The Secretary's view of this evidence, however, ignores Lewis' testimony of what he does at the pool hall and which television shows he watches, as well as his mother's testimony. Lewis testified that although he visits the pool hall (hitchhiking to get there), he can no longer play pool or pinball machines. Instead, he sits or stands around drinking Pepsi and watching others play. Lewis stated that he watches cartoons and movies—mostly westerns—on television. His mother corroborated this, but noted that he is unable to comprehend plots of movies and simply "roots for the good guys." In addition, he no longer understands news broadcasts or sporting events. For example, he does not understand why fouls are called in basketball games, although he used to play this and other sports.

Mrs. Lewis testified that Lewis' short-term memory is so bad that he has trouble performing simple tasks or errands such as carrying items from the basement. As she stated, if you tell him "more than one or two things to do at one time, he'll forget it or he'll get it mixed up and he won't do it right." She further related that she might send him to a small grocery store where the clerk "knew him and could help him get the groceries," but would not send "him to a chain store like Krogers and expect him to do the shopping." She noted that even if she wrote the grocery list down, "he might remember having the list in his pocket, he might not." This testimony convinces us that there is not substantial evidence to support a finding that Lewis suffered no "marked restriction in daily activities."

Second, the Secretary asserts that Lewis' personal habits have not deteriorated. Again, we disagree. The Secretary relies solely on Dr. Wagaman's report to support his assertion concerning Lewis' personal habits. In his report, Dr. Wagaman noted that Lewis appeared for the psychological testing "casually but neatly dressed and groomed." The fact that he appeared at a hearing or evaluative testing in a well-groomed state does not contribute toward satisfying the substantial evidence burden for finding that Lewis' personal habits have not deteriorated. *See DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930, 935 (2d Cir.1984). To allow a claimant's appearance at a hearing or medical evaluation to govern a finding on personal habits would be akin to applying "sit and squirm" jurisprudence to claimants who allege disability based on pain. *See Shively v. Heckler*, 739 F.2d 987, 992 (4th Cir.1984) (Hall, J., dissenting); *Aubeuf v. Schweiker*, 649 F.2d 107, 113 (2d Cir.1981); *Tyler v. Weinberger*, 409 F.Supp. 776, 789 (E.D.Va.1976). In this case, the evidence demonstrates that Lewis' personal habits have deteriorated since the aneurysms and surgery. Mrs. Lewis testified that "when he's eating, a lot of times he slobbers like a little child or he'll get food along the right side of his face and along his chin. He doesn't know it's there. You tell him to wipe it off before he even knows that it's there." The evidence the Secretary relies on to support a finding of no deterioration in personal habits is inappropriate and there is not substantial evidence otherwise to support such a finding.

Third, the Secretary points to Dr. Wagaman's statement that Lewis had "somewhat restricted levels of consistent interest and motivation" and argues that, because

the statement does not indicate the level of restriction, Lewis failed to establish it rose to a "marked" level.[4] As noted, Mrs. Lewis testified concerning Lewis' severely diminished attention span and interest in television programs. She also testified that he sleeps a large amount of time and tends to doze off while talking to family members. This simply does not constitute substantial evidence to support a finding of no "constriction of interests."

Finally, the Secretary again points to Dr. Wagaman's report, which indicates that Lewis "related amiably and cooperatively and was consistently responsive," to support a finding that Lewis' ability to relate to others has not been impaired. We cannot agree that this isolated statement in the report provides substantial evidence for the Secretary's position. Lewis' I.Q. dropped twenty-six points, from 104 to 78, as a result of the aneurysms and surgery. Moreover, Dr. Wagaman reported, *inter alia*, that Lewis exhibits diminished proficiencies in processing environmental information, abstract thinking, personal and situational flexibility and adaptability, and applying past learning appropriately to new situations. These clinical findings, which relate to Lewis' ability to act appropriately in social situations, were supported and corroborated by Mrs. Lewis' testimony about Lewis' actions on a daily basis. She noted that Lewis acts in a childlike manner rather than as an adult. For example, he plays with his children as though he were another child, not an adult. He becomes upset if he receives a bad card when playing simple card games and throws his cards across the table. He also gets upset when he is teased because he takes statements literally.

In summary, we are persuaded that substantial evidence does not support the Secretary's finding that Lewis did not meet or equal any listing in Appendix 1. Lewis established that he meets or equals the requirements of Listing § 12.02. We therefore reverse the decision of the district court and remand for entry of an order requiring the award of disability benefits to Lewis.

REVERSED AND REMANDED.

HAYNSWORTH, Senior Circuit Judge, dissenting:

I respectfully dissent.

I would have no objection if the position of the majority was that the case should be remanded to the Secretary for more explicit findings of fact addressing the requirements of Listing § 12.02. The majority, focusing attention upon the testimony of the mother, concludes that all the requirements of that Listing were met, but I cannot agree that a conflicting inference from the entire record was impermissible.

Dr. Dy and Dr. Wagaman each found that Lewis was alert and coherent. Dr. Dy found that Lewis was oriented, with clear and fluent speech. Dr. Wagaman found him cooperative, and both physicians found him responsive. Dr. Wagaman noted those things that interested Lewis and filled his daily life as reported by Lewis to the physician, and those interests appeared to be substantially those things that interested Lewis before he suffered any problem with his arteries. Finally, the vocational expert, after an examination of the medical reports, concluded that Lewis was capable of numerous light or sedentary jobs not requiring sustained manipulative use of the right hand.

There is no doubt that Lewis suffered a substantial decline in his intelligence quotient or that there is substantial loss of strength and dexterity in the use of his right arm and hand. He can go to the pool hall, but he cannot play pool as he once did.

Listing § 12.02B requires:

B. Resulting persistence of marked restriction of daily activities and constric-

---

**4.** We question whether the regulation requires a "marked" decrease in interest and motivation. It states there must be "[r]esulting persistence of marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people." "Marked" appears to modify only the "restriction of daily activities." Even if it does apply to the necessary "constriction of interests," we are persuaded that Lewis meets that criterion.

tion of interests and deterioration in personal habits and seriously impaired ability to relate to other people.

Based upon the mother's testimony, a fact finder might find all of those things to be present. They are not apparent in the reports of the examining physicians. Indeed, those reports present a very different picture with no substantial constriction of interests and no impaired ability to relate to other people. On the contrary, they found him cooperative and responsive, qualities not ordinarily to be found in persons with "seriously impaired ability to relate to other people."

The fact finding responsibility is not committed to appellate judges such as we. It is committed to the Secretary. Since the majority, at best, establishes no more than a conflict in the testimony, I must respectfully dissent.