In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1515

LINDA SIMS,

*Plaintiff-Appellant,*

v.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 01 C 159—**Sarah Evans Barker**, *Judge.*

ARGUED AUGUST 6, 2002—DECIDED OCTOBER 4, 2002

Before POSNER, EASTERBROOK, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Linda Sims appeals from the district court's order upholding the denial of her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") by the Social Security Administration ("SSA"). Sims contends that the decision by the Administrative Law Judge ("ALJ") is not supported by substantial evidence because the ALJ ignored or misstated significant medical findings in the record. We affirm the district court's judgment.

## I. Background

Sims was born in 1952 and has a high school equivalent education. In the early 1990's she worked as a cashier, but stopped working in July 1995, allegedly because of migraine headaches, hypertension, difficulties concentrating, memory problems, anxiety, depression, shortness of breath, and chronic pack pain. Despite those problems, Sims worked at home in 1996 and 1997 as a part-time telemarketer.

### A.  Sims's Physical Impairments

Sims was first diagnosed with hypertension in October 1995 after complaining of migraine headaches and blurred vision. A doctor at Wishard Memorial Hospital ("Wishard") in Indianapolis noted Sims's elevated blood pressure and prescribed anti-hypertensive medication. A week later the doctor noted that Sims's blood pressure had "greatly improved," and Sims reported a decrease in headaches. Sims stopped taking her medication two months later because she allegedly could not afford the cost. In December 1996 Dr. Eugena Burrow documented Sims's elevated blood pressure and encouraged Sims "to follow up for appropriate treatment of her blood pressure." Sims did not receive any treatment until September 1997, when Dr. Kendrick Henderson noted her elevated blood pressure and prescribed anti-hypertensive medication. In the following months Sims's blood pressure remained high, and numerous medical reports indicate that Sims often did not take her medication as prescribed.

Sims went to the emergency room three times in April 1998 and once in August 1998, each time due to syncope (fainting). Sims's examination in August for syncope included a computed tomography ("CT") scan of her brain,

which, according to Dr. Stacy Greenspan, revealed "generalized atrophy" and "focal areas of decreased attenuation" that were consistent with old lacunar infarcts.[1] The CT scan, however, revealed no acute abnormalities. Her discharge summary opined that the syncope episodes were most likely due to dehydration.

Sims's kidney problems were first recognized in May 1998 when she underwent a renal scan for her elevated renin[2] level. Dr. Henderson noted that the scan did not reflect the location of Sims's right kidney. During Sims's hospitalization a few months later for syncope, a CT scan revealed a normal left kidney and a small right kidney that appeared to "function somewhat symmetrically" with the left kidney. The discharge summary concluded that Sims's "small kidney may be contributing to blood pressure problems and even syncope" and that her "[i]ncreased renin may be due to possible renal artery stenosis of the right kidney."[3] The following month Dr. Hee-Myung Park concluded that a renal scan revealed a decrease in Sims's left kidney function from the previous May as well as a nonfunctioning right kidney. In early 1999 Dr. Harold Lenett noted that Sims's right renal arteries were completely occluded and that she had a single left renal artery

---

[1] A lacunar infarct is a small lesion in the brain caused by a deficiency of blood circulation to the area. W.B. Saunders Co., *Dorland's Illustrated Medical Dictionary* 894-95, 956 (29th ed. 2000).

[2] Renin is an enzyme formed by the kidneys that is instrumental in controlling blood pressure. Merck Research Laboratories, *The Merck Manual of Medical Information* 695 (1st ed. 1997).

[3] Renal artery stenosis is the narrowing of renal arteries so that renal functioning is impaired. *Dorland's, supra* note 1 at 1698.

with mild stenosis, which was "probably not clinically significant." Despite these kidney problems, Sims's highest serum creatinine level[4] was 1.4 mg/dL—only slightly higher than the normal range of 0.6-1.2 mg/dL. *See The Merck Manual, supra* note 2 at 1375.

At the request of the state agency, Dr. Angel Ablog examined Sims in May 1998. Dr. Ablog noted Sims's hypertension, found no problems with motor functioning, and reported that Sims's "gait [wa]s strong, steady, and fair." The following September, Dr. Henderson examined Sims and diagnosed hypokalemia (low potassium concentration in the blood) and severe hypertension related to renal artery stenosis. He concluded that Sims's hypertension and hypokalemia were controllable with treatment and warned Sims to avoid heavy lifting and strenuous activities until her potassium and blood pressure were normalized.

## B.  Sims's Mental Impairments

In February 1998 psychologist J. Mark Dobbs examined Sims at the request of the state agency. He diagnosed "Major Depression, recurrent, mild" and "Panic disorder with agoraphobia (agoraphobia mild)." He noted Sims's poor concentration, but described her as cooperative and oriented. Dr. Dobbs documented no motor or neurological impairments, but noted that Sims complained of frequent headaches. Dr. Dobbs assigned Sims a Global Assessment

---

[4]  Excretion rates of creatinine are used as diagnostic indicators of kidney function. *Id.* at 417.

of Functioning ("GAF")[5] rating of 60. Three months later Sims was assigned a GAF rating of 70.

At the request of the state agency, psychologist Dr. Steven Herman evaluated Sims in December 1998. Sims underwent numerous psychological tests, and Dr. Herman concluded that Sims's IQ of 72 was "within the borderline range." Sims's reading, spelling, and arithmetic scores were consistent with her IQ, but her performance on the Halstead-Reitan Neuropsychological Battery[6] showed "very poor spatial memory" and "poor strategizing [sic] skills." Dr. Herman assigned Sims a GAF rating of 68.

## C. Sims's Applications for DIB and SSI

In October 1997 Sims applied for DIB and SSI benefits, but the SSA denied them. Sims then had a hearing before an ALJ at which she and a vocational expert ("VE") testified. At the hearing Sims recounted her medical problems and testified that although she rarely socialized with others, she drove approximately fifteen miles a week, went grocery shopping, did her laundry, attended church

---

[5] The GAF scale reports a "clinician's assessment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A GAF score of 60 reflects moderate symptoms or "moderate difficulty in social, occupational, or school functioning." *Id.* at 32. A GAF score of 61-70 reflects mild symptoms or "some difficulty" in those areas, but the individual "generally function[s] pretty well." *Id.*

[6] The Halstead-Reitan Neuropsychological Battery is a set of "neuropsychological tests . . . used to study brain-behavior functions including determining the effects of brain damage on behavior." *Stedman's Medical Dictionary* 194 (27th ed. 2000).

every other week, fed and dressed herself, and cooked dinner. She also admitted that her medication calmed her and lowered her blood pressure.

After hearing the testimony, the ALJ denied Sims's claims using the familiar five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ was satisfied at Step 1 that Sims had not engaged in substantial gainful activity since her on-set date of July 27, 1995, even though she had worked as a part-time telemarketer in 1996 and 1997. The ALJ then concluded that Sims satisfied Step 2 because she had a combination of severe impairments, including hyperten-sion, kidney disease, anemia, lacunar infarcts, border-line intellectual functioning, and depression. At Step 3, however, the ALJ concluded that those impairments, considered alone or in combination, did not meet or equal in severity any listed impairment presumed severe enough to preclude gainful work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1; 20 C.F.R. §§ 404.1520(d), 416.920(d). Thus, the ALJ moved to Step 4 and, based on the testi-mony of the VE, concluded that Sims was unable to per-form her past relevant work. Finally, the ALJ considered Sims's residual functional capacity ("RFC") under Step 5 to determine if other work existed that Sims could per-form. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ concluded that Sims could perform "simple and repetitive light work (standing and walking for at least six hours per day, with maximum lifting of twenty pounds and frequent lifting of ten pounds) not involving unusual stress, driving, work at unprotected heights, or operat-ing dangerous moving machinery." Relying on the testi-mony of the VE, the ALJ found that approximately 8,600 such jobs—6,780 assembly jobs, 830 production worker jobs, and 990 hand sorter jobs—existed in the state of

Indiana. Accordingly, the ALJ denied Sims's applications, and the Appeals Council denied Sims's request for review.

## II. Analysis

We will uphold the ALJ's decision if it is supported by substantial evidence, but will remand the case if the decision contains legal error. *Dixon*, 270 F.3d at 1176. Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In reviewing the ALJ's decision, we will not reweigh the evidence or substitute our own judgment for that of the Commissioner. *Id.*

### A.  Step 3 Determination

Sims contends that her impairments are severe enough for her to qualify automatically for benefits under Step 3. She argues that she qualifies under listings 6.02 (impairment of renal function), 11.04B (central nervous system vascular accident), 12.02 (organic mental disorder), 4.03 (hypertensive cardiovascular disease), 12.04 (affective disorder), and 12.06 (anxiety related disorder). To be found presumptively disabled, Sims must meet all of the criteria for a listed impairment or "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis in original).

Sims first argues that she qualifies under listing 6.02 because of "left kidney-renal artery stenosis and right kidney total dysfunction." To qualify under listing 6.02, a claimant must have an impairment of renal function

that either raises the claimant's serum creatinine to 4.0 mg/dL or requires dialysis or a kidney transplant. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.02. Because the record does not indicate that Sims requires dialysis or a kidney transplant, the ALJ analyzed Sims's kidney problems in terms of her serum creatinine levels. The ALJ then concluded that Sims did not qualify under this listing because her creatinine levels ranged from 1.1 to 1.4 mg/dL and did not approach the threshold listing level of 4.0 mg/dL.

Despite this failure to meet the threshold requirement, Sims argues that the ALJ's decision is not supported by substantial evidence because he ignored or misstated (1) Dr. Schauwecker's report of "significant problems" in her right kidney; (2) the discharge summary in August 1998 concluding that her "small kidney may be contributing to blood pressure problems and even syncope" and that her "[i]ncreased renin may be due to possible renal artery stenosis of the right kidney"; and (3) Dr. Park's report indicating a decrease in left kidney functioning and a nonfunctioning right kidney. The ALJ's failure to address these specific findings, however, does not render his decision unsupported by substantial evidence because an ALJ need not address every piece of evidence in his decision. *See Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). The ALJ need only build "a bridge from the evidence to his conclusion." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). Such a bridge is present here because the ALJ acknowledged that Sims's kidney problems were severe and cited numerous medical reports (including the 1998 discharge summary) showing that her serum creatinine levels were well below the threshold listing level. Moreover, none of the evidence that Sims contends the ALJ ignored or misstated establishes a disability under listing 6.02. First, Dr. Schauwecker concluded merely that he could not identify a right kidney on the scan,

but later tests confirmed that Sims did have a small right kidney. Additionally, neither the 1998 discharge summary nor Dr. Park's report concluded that Sims's kidney problems raised her serum creatinine level above 4.0 mg/dL or required dialysis or a transplant. And Sims does not explain why she believes her decreased kidney functioning equals in severity the criteria under listing 6.02. Thus, Sims has not established that the ALJ's conclusion lacked substantial evidence.

Sims next argues that she qualifies under listing 11.04B based on her "multiple lacunar-cerebral infarcts (strokes) with numbness and decreased strength of the left upper extremity." This listing requires a central nervous system vascular accident with "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station," lasting more than three months post-vascular accident. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04B. Sims contends that the ALJ's conclusion is unsupported by substantial evidence because the ALJ ignored Dr. Greenspan's conclusion that her CT scan showed "generalized atrophy" and "focal areas of decreased attenuation" that were consistent with old lacunar infarcts. But the ALJ acknowledged in his Step 2 analysis that Sims had lacunar infarcts and cited Dr. Greenspan's report in his Step 3 analysis. Moreover, the mere existence of old lacunar infarcts does not automatically satisfy listing 11.04B because it provides no insight to Sims's motor functioning in two extremities. And Sims does not even attempt to explain how her infarcts meet or equal in severity the criteria of 11.04B.

The ALJ, on the other hand, thoroughly analyzed the criteria under 11.04B and correctly relied on Sims's medical reports to conclude that her impairments did not

meet or equal in severity the listed criteria. First, the ALJ relied on Dr. Burrow's conclusion that Sims did not have significant motor functioning problems because Sims had a full range of motion in her spine, shoulders, elbows, wrists, hands, knees, ankles, feet, and hips. Moreover, she could stand on one leg, walk on heels and toes, and tandem walk. The ALJ also cited Dr. Ablog's conclusion that Sims's "gait [wa]s strong, steady, and fair." Additionally, in concluding that Sims's doctors did not regard her infarcts "as a source of continuing symptoms," the ALJ relied on Sims's 1998 discharge summary indicating that there was no need "to repeat this hospitalization with normal [sic] neuro exam." Thus, because Sims does not address how the existence of old lacunar infarcts affected her motor functioning in two extremities and because she fails to point to anything in the record to challenge the ALJ's conclusion, Sims has not shown that the ALJ's conclusion was unsupported by substantial evidence.

Sims next argues that she qualifies under listing 4.03 based on hypertension. Listing 4.03 requires evaluation under listings 4.02 (chronic heart failure), 4.04 (ischemic heart disease), or the listings for the affected body system, including 2.02, 2.03, 2.04 (various visual impairments), 6.02 (impairment of renal function), or 11.04 (central nervous system vascular accident). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.03. Sims fails to identify the relevant listing for her impairment, but the record does not reflect any significant visual impairments and, as discussed earlier, the ALJ did not err in concluding that Sims did not qualify under listings 6.02 and 11.04. That leaves listings 4.02 and 4.04, and, as the ALJ concluded, Sims failed to present evidence that her impairments met or equaled in severity the detailed criteria associated with chronic heart

failure and ischemic heart disease. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 4.02, 4.04.

But Sims contends that the ALJ's conclusion was not supported by substantial evidence because the ALJ ignored or misstated various medical reports documenting her high blood pressure. The ALJ, however, discussed Sims's hypertension in its analysis under Steps 3 and 4. The ALJ relied on Dr. Henderson's report from September 1998 and the medical reports from January and March 1999 concluding that Sims's hypertension is "controllable." Moreover, the ALJ cited Dr. Zafer's January 1998 report and a March 1998 report from Dr. Henderson concluding that Sims's hypertension resulted in no end-organ damage. The ALJ also cited various medical reports documenting Sims's noncompliance with her blood pressure medication. Additionally, the ALJ recognized that Sims's syncope had been associated with abnormal EKG readings, but the ALJ relied on Sims's 1998 discharge summary concluding that her arrhythmias were associated with dehydration and a resulting electrolyte imbalance.

Sims, however, argues that three medical reports from late 1997 prove that her high blood pressure was "chronic and persistent despite medical intervention." Although those reports document Sims's high blood pressure at certain intervals, the report from September 8, 1997, indicates that Sims did not take her blood pressure medication that morning, and the report from November 21, 1997, shows that Sims had run out of her blood pressure medication. Thus, those reports do not prove that Sims's hypertension equals in severity chronic heart failure or ischemic heart disease, and the ALJ did not err by relying instead on Dr. Henderson's conclusion that Sims's hypertension was controllable. *See Clifford,* 227 F.3d at 870 (not-

ing that a treating physician's opinion "is entitled to controlling weight if it is well supported by the medical findings and not inconsistent with other substantial evidence in the record").

Sims finally argues that she qualifies under mental impairment listings 12.02 (organic mental disorder), 12.04 (affective disorder), and 12.06 (anxiety related disorder). Among other criteria, each of these listings requires that the claimant's mental impairments result in at least two of the following problems: (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02B, 12.04B, 12.06B (commonly known as "the B criteria"). The ALJ concluded that although Sims was mildly to moderately limited in these areas, her mental impairments did not result in the significant functional limitations contemplated by these criteria. Sims does not mention "the B criteria" and presents nothing to undermine the ALJ's conclusion.

Moreover, none of the evidence that Sims contends the ALJ ignored or misstated establishes that her impairments met or equaled in severity the criteria under listings 12.02, 12.04, and 12.06.

Sims argues that the ALJ misstated Dr. Herman's psychological evaluation of her performance on the Halstead-Reitan Neuropsychological Battery showing "many errors in several areas which confirmed her organic brain damage." The ALJ, however, cited Dr. Herman's conclusion that Sims's cognitive problems are "much more likely . . . a manifestation of her depression, and not the result of organicity." Sims also contends that the ALJ ignored or misstated the conclusions of various doctors that she

suffered from agoraphobia and depression. The ALJ, however, acknowledged Sims's agoraphobia in his analysis under Step 4 and her depression in his analysis under both Step 2 and Step 4. But the ALJ noted that Dr. Dobbs characterized those conditions as mild. Thus, Sims has failed to show that the ALJ's conclusion was not supported by substantial evidence.

## B. Step 5 Determination

Sims contends that substantial evidence fails to support the ALJ's Step 5 determination because the VE testified that she would be unemployable if her allegations of physical and mental limitations were credible. But the ALJ did not find all of Sims's allegations credible, concluding that Sims's "testimony and statements about the intensity, persistence, and limiting effects of her symptoms are not reasonably consistent with the record as a whole." This court will not disturb an ALJ's credibility findings unless they are patently wrong. *See Diaz*, 55 F.3d at 308.

Nonetheless, in assessing Sims's RFC of simple and repetitive light work, the ALJ considered some of Sims's allegations as well as the limitations imposed by her impairments. The ALJ recognized Sims's history of syncope and complaints of dizziness by concluding that she could not drive, perform jobs involving dangerous moving machinery, or work at unprotected heights. The ALJ also considered Sims's mental impairments by concluding that she could not perform jobs involving complex work processes or unusual levels of stress. Moreover, based on Dr. Henderson's suggested limitation of heavy lifting and strenuous activity, the ALJ concluded that Sims could not lift or carry more than ten pounds frequently or twenty pounds occasionally.

The VE considered the above limitations when determining whether jobs existed in Indiana that Sims could perform. The ALJ explained to the VE that those limitations resulted from kidney disease with hypertension, headaches, history of lacunar infarcts, anemia, borderline intellectual functioning, depression, and a history of alcoholism. Taking into account all of those impairments and limitations, the VE testified that approximately 8,600 jobs were available in Indiana that Sims could perform. The ALJ did not err in relying on that testimony because it reflected Sims's impairments to the extent that the ALJ found them supported by the evidence in the record. *See Ehrhart v. Secretary of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

Before closing, we make one final observation about disability evaluations carried out by ALJs. We remind ALJs that they must not narrowly confine their review to isolated impairments when the record shows that the impairments have some "combined effect." *See* 20 C.F.R. §§ 404.1520, 416.920. Here we are persuaded that the ALJ considered the combined effect of Sims's impairments because he ensured that the VE took into account all of Sims's impairments when determining whether jobs existed in Indiana that Sims could perform. The ALJ's evaluation in this case was therefore acceptable, though we urge the SSA in the future to carefully examine the issue of disability in light of a claimant's total impairments.

### III. Conclusion

For the foregoing reasons we AFFIRM the judgment of the district court.

POSNER, *Circuit Judge*, dissenting.   According to the uncontroverted facts, the applicant for disability benefits, Linda Sims, age 46 at the time of the administrative law judge's decision, is of dwarfish stature (4 feet 9 inches), is anemic, and has a shriveled kidney that may be responsible for her stratospheric blood pressure (220/108). Her blood pressure is controllable by medication, but she sometimes forgets to take it. She has had three strokes, has bouts of depression, a history of alcoholism, and an IQ of only 72—a combination of mental and psychological deficiencies implying a level of mentation at which it is easy to forget things. She is prone to fainting. The idea that she is capable, as the administrative law judge found, of doing "light work"—which is not sedentary work, but is light factory work—"standing and walking" (I am quoting the ALJ) "for at least six hours per day, with maximum lifting of twenty pounds and frequent lifting of ten pounds," see *Allen v. Sullivan*, 977 F.2d 385, 389-90 (7th Cir. 1992), is laughable. No employer would *dare* to hire her. Her fainting fits alone would make her a menace to her co-workers as well as herself in a factory setting and expose her employer to substantial liability, as in *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044-45 (7th Cir. 1989). It is true that she once had more or less regular employment; but as the ALJ correctly determined, in recent years her work has been too sporadic to count as substantial gainful employment.

Although the majority opinion states that the ALJ "considered the combined effect of Sims's impairments," the opinion goes on to make clear that he did so in an oblique way, though it was approved in *Perez v. Secretary of Health & Human Services*, 958 F.2d 445, 448 (1st Cir. 1991) (per curiam): namely by asking a vocational expert whether, assuming Sims had the impairments the administrative law judge had found, there is a substantial num-

ber of factory jobs in Indiana that she can perform. I will not question the method of taking into account the totality of Sims's impairments; but the implementation of the method fell woefully short. To begin with, the administrative law judge instructed the vocational expert to take into account the fact that Sims has "the equivalent of a high-school education." (She left school after the eighth grade but later earned a GED certificate.) That was irrational. Sims obtained the equivalent of a high-school education before she had any strokes, a point ignored by the ALJ; he might as well have said of an Alzeimer's patient that he might still be able to work because he had a college degree. It is surprising that he made this mistake since he was mindful of the fact that she had ceased being gainfully employed, presumably because of her strokes and other ailments.

More important, the ALJ failed to include Sims's blood pressure and resulting fainting fits in the list of impairments on which the vocational expert was to base the judgment of disability. His ground for the omission was that Sims's blood pressure is controllable by medication. The ALJ failed to connect Sims's low intelligence with her failure to take her medicine regularly. She is not being willful; her low intelligence makes her unable to remember to take her medicine. The ALJ thus withheld from the vocational expert the key "combined effect of Sims's impairments"—namely the interaction between her low IQ and her high, though theoretically controllable, blood pressure. As a result, the vocational expert's finding, on which the ALJ, who made no independent judgment of the combined effect of Sims's impairments, based his denial of disability benefits, rests on air.

The majority opinion indicates misgivings about the handling of the "combined effect" issue by "urg[ing] the [Social Security Administration] in the future to carefully

examine the issue of disability in light of a claimant's total impairments." For Sims, the future is now. She was entitled to a competent examination of the issue of disability in light of her total impairments. She did not receive it.

A true Copy:

     Teste:


                   _____

                  *Clerk of the United States Court of Appeals for the Seventh Circuit*