Robin S. SMITH, Plaintiff–Appellant,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant–Appellee.

No. 02–2611.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 2003.

Decided March 18, 2003.

Before ROVNER, EVANS, and WILLIAMS, Circuit Judges.

ORDER

Robin Smith appeals the district court's decision upholding the denial of her application for Social Security disability benefits, claiming that the final decision of the Commissioner was not supported by substantial evidence. We agree, and accordingly vacate the district court's judgment and remand this matter for further proceedings.

1. Medical History

Smith, a high school graduate, was 35 and working as a transcriptionist at a State Farm office at the time she claims to have become disabled in September 1996.

On September 5 she suffered a generalized seizure, and although she previously had not experienced any neurological symptoms a subsequent CT scan revealed that she had a brain tumor. Smith was placed on anti-seizure medications, and a biopsy of the tumor revealed that it was a grade 2 oligodendroglioma.[1] In November 1996 neurologist Richard Dirrenberger "debulked" or removed the tumor, noting in an Operative Report that although it appeared all of the tumor had been removed, "knowing the nature of this tumor it was not felt that this was a curative resection."

Smith was examined in December 1996 by neurologist Nicolaas de Wette, who stated in a progress note that a post-operative MRI was abnormal and revealed "a large extensive area of intraparenchymal[2] abnormality" which could represent either residual tumor or changes to the brain caused by the surgery. He also noted that Smith experienced "some memory loss and is occasionally forgetful of names, numbers, and dates," and stated that while she suffered from "no gross sensory deficits" she did have some deficits in abstract thinking. A subsequent MRI in January 1997 revealed that the tumor mass was "essentially unchanged." Smith was examined in February 1997 by neurologist Phillip Green, who noted that she had occasional problems with "word finding" and reported "some problems with concentration." A note in Smith's medical records in March 1997 stated that she occasionally misspoke but was otherwise neurologically intact. Dr. Green examined Smith again in March and noted that she was "focusing better and her abili-

ty to pay attention to details has improved."

In May 1997 Smith was examined by neurologist Dr. Edward Dropcho. She reported having "word finding difficulty" that had not changed over the previous few months, and Dr. Dropcho observed that she was alert and oriented with "normal cognition and memory" and that sensory and cerebellar testing were normal. An MRI was "not markedly different" from the January 1997 scan. Smith was also examined in May by Dr. Kevin Dodt, apparently a general practitioner, who noted that she had been feeling depressed for "over eight years" and had only a "fair at best" ability to concentrate, decreased ambition and appetite, and was irritable. Smith reported that she frequently stayed in her pajamas all day and did not leave the house, and that her family has a history of depression.

Smith visited Dr. Dropcho again in July 1997, complaining "that written material does not make sense." She denied having other neurological symptoms, and Dr. Dropcho observed that she had fluent speech with "normal naming, repetition, and comprehension," and normal cerebellar testing. Dropcho concluded that there were "no definite focal findings on neurological exam." She visited Dr. Dropcho again in September, when another MRI revealed "no significant overall change" in her tumor. Smith continued to complain of chronic fatigue, irritability, and difficulty with making judgments. Dr. Dropcho observed that she had "grossly normal memory, cognition and speech" and normal

---

**1.** An oligodendroglioma is "a tumor arising from the oligodendroglia," the tissue which forms the myelin sheaths of white matter in the brain and spinal cord. *See* J.E. Schmidt, Attorney's Dictionary of Medicine at O–40 (2002).

**2.** Parenchyma is "[t]he active tissue or part of an organ, which performs the function of the organ, as distinguished from the framework or supporting tissues." *See* Attorney's Dictionary of Medicine at P–80. Thus, this appears to indicate damage to the brain itself, as opposed to the oligodendroglia.

cerebellar testing, concluding that there was "no evidence for tumor progression" and that her cognitive complaints were "probably due to a combination of frontal lobe dysfunction and depression."

In September 1997 Smith was examined at Ingwell Psychological Services by psychologist Nancy Ingwell. In a report entitled "Social Security Disability Mental Status Examination," Ingwell diagnosed Smith as suffering from "Major Depression, Recurrent, Severe," and found that she had a Global Assessment of Functioning (GAF) score of 60, meaning that she suffered from "moderate symptoms."[3] Later that month Smith's psychiatrist, Dr. Shaun Wood, completed a Report of Psychiatric Status for the State of Indiana Disability Determination Bureau. He stated that Smith suffered from "major depression recurrent" and had a GAF score of 52, which still indicated moderate symptoms of depression or moderate difficulty in social, occupational, or school functioning. Dr. Wood noted that Smith appeared depressed, had moderately slowed behavior and speech, and had problems with attention and concentration. He further stated that Smith suffered from significant problems with memory and was unable to concentrate and attend to tasks, which interfered with her work. While he found her judgment to be normal, Smith showed a deficit in concentration. He noted that she was able to care for her basic hygiene and nutritional needs, but that she could not perform a simple task for a two-hour period because of her difficulty concentrating, which would cause her to be slow, make mistakes, and need assistance.

In October Dr. Dropcho completed a disability determination questionnaire, stating that Smith complained of fatigue, irritability, and difficulty making decisions. He noted, however, that her condition was "stable" with no tumor progression and that her cognitive complaints were "probably due to frontal lobe dysfunction and depression." In October a state agency examining physician filled out a form SSA–831–C3 stating that Smith was not disabled. This determination was affirmed in January 1998 by another state agency physician, who stated that "the medical evidence shows that your condition does not limit all of your activities."

A December 1997 Social Security Administration form SSA–2506–BK, Psychiatric Review Technique Form, apparently completed by a state agency physician, stated that although Smith suffered from major depression, her impairments were not severe. It noted that she suffered only slight restrictions in her daily living and difficulties in social functioning, and seldom had deficiencies of concentration, persistence, or pace resulting in failure to timely complete tasks. A functional capacity assessment completed around this time on form SSA–4734–BK, again apparently by a state medical consultant, stated that Smith had no limitations to her ability to work.

In December 1997 Smith was examined by Dr. Dropcho, who noted that she reported continuing difficulty with short-term memory, information processing, and judgment, although her symptoms had not changed since her last visit. She saw Dr. Dropcho again in January 1998, and he

---

**3.** The Global Assessment of Functioning Scale indicates a "clinician's judgment of the individual's overall level of functioning." *See* Diagnostic and Statistical Manual of Mental Disorders at 32 (4th Ed., Text Revision, 2000). A

GAF of 60 indicates that a person suffers from moderate symptoms of mental illness or moderate difficulty in social, occupational, or school functioning. *Id.* at 34.

noted continuing problems with "memory and higher cognitive functions."

Smith was also analyzed in January by Dr. David Kareken, a neuropsychologist, who noted that she complained of poor concentration, difficulty comprehending others, trouble spelling, and memory impairment. Dr. Kareken found that Smith had logical and sequential thoughts, low-normal to normal auditory working memory, and "mild difficulty" in visual working memory. She demonstrated "impaired abstraction and markedly perseverative responding" during novel problem solving, and had low-normal to borderline short-term recall. Smith also demonstrated impairment in memory in the presence of mental distraction and had mildly inaccurate comprehension of complex commands. Dr. Kareken concluded that her "[m]emory consolidation under conditions of mental distraction is ... markedly abnormal" which, combined with her other executive deficits, was "sufficiently severe to support an application for disability." He also determined that she would not be able to work as a transcriptionist or any other job that "requires divided attention or independent problem solving."

Dr. Dropcho examined Smith in April 1998, noting that she still suffered from mild impairment of short-term memory and calculations, and that the tumor showed minor increase in size. A subsequent MRI in September 1998 showed that the tumor had increased slightly in size.

2. Claim History

Smith applied for disability insurance benefits in 1997, and her application was denied both on initial examination and on reconsideration. Smith requested a hearing, which was held before an ALJ on November 20, 1998. She testified that she had attempted to go back to work as a transcriptionist after her surgery in 1996 but "couldn't do it anymore" because she could not type as quickly as before and did not understand what people were saying on dictation. She stated that she was unable to work because she had trouble understanding directions, difficulty with speech comprehension, and problems with both her short- and long-term memory, and was tired and suffered from headaches. Smith related that she had trouble performing simple tasks, such as cooking, because she could not remember what to do and had a difficult time focusing on what people were saying to her. Smith testified that she was able to manage her frequent headaches with Tylenol, but took numerous naps during the day because of fatigue. She further stated that she was taking Prozac for her depression, but that she still had days where she had a hard time getting out of bed. Smith also related that she attended church and a Christian Life Group regularly, and was able to feed and dress herself and do some cooking, laundry, and housework. The ALJ posed several hypothetical questions to vocational expert Constance Brown about the availability of jobs for a person with infirmities similar to Smith's. Brown testified that there were numerous jobs in the national economy that a person with headaches, asthma, and depression could perform. She further testified, however, that an individual who also suffered from severe fatigue or significant problems following simple directions would not be able to perform any work.

In his decision, the ALJ followed the five-step analysis mandated by 20 C.F.R. § 404.1520 to determine whether Smith was disabled. At steps 1 and 2, he determined that Smith was unemployed and

suffered from severe impairments, including oligodendroglioma, headaches, asthma, and depression. At step 3 he determined that none of Smith's impairments, either alone or in combination, meet or equaled an impairment listed in 20 C.F.R. § 404, Subpt. P, App. 1. At step four, the ALJ determined that Smith could not return to her past job but retained the residual functional capacity to perform "simple and repetitive work at all exertional levels in an environment relatively free of noxious fumes, gases, and respiratory irritants, not involving unusual stress, driving, work at unprotected heights, or the operation of dangerous moving machinery." Finally, with respect to step 5, the ALJ determined that the Commissioner had met her burden of proving that Smith could perform jobs which exist in significant numbers in the national economy – namely as a maid, assembler, hand packager, janitor, cashier, or clerical worker.

Smith filed a request for review of the ALJ's decision with the Appeals Council, which denied the request on May 15, 2001. Thus, the ALJ's opinion constitutes the Commissioner's final decision. Smith filed a civil action for judicial review of the Commissioner's determination, which the district court affirmed on June 4, 2002. Smith timely appealed to this court.

## DISCUSSION

Smith argues generally that the Commissioner's decision to deny her disability benefits was not supported by substantial evidence. We will uphold the Commissioner's decision if it is supported by substantial evidence and no error of law occurred. 42 U.S.C. § 405(g); *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as ade-

quate to support the decision. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir.2002). In reviewing the Commissioner's disability determination, we do not reweigh the evidence or substitute our own judgment for that of the Commissioner. *Sims,* 309 F.3d at 428.

### 1. ALJ's Step 3 Determination

Smith first asserts that the ALJ's determination at step 3 that her impairments did not meet or equal any of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1 was not supported by substantial evidence. The ALJ determined that Smith did not meet the criteria of listings 11.05B (brain tumor), 12.02 (organic mental disorders) or 12.04 (affective disorders) and was therefore not disabled. (He also considered whether Smith's impairments met the criteria of numerous other listings, but she has not appealed from his determination that they did not.)

With respect to listing 11.05B, Smith argues that the ALJ erroneously failed to demonstrate in his decision that he considered numerous pieces of evidence which "described the dimensions and severity of her brain tumor, showed the tumor was gradually increasing despite surgery, and reported that she had several brain surgeries." While an ALJ may not disregard entire lines of evidence that are contrary to his findings, he need not provide a complete written evaluation of every piece of testimony and evidence in the record. *Henderson v. Apfel,* 179 F.3d 507, 514 (7th Cir.1999). Here, the evidence he allegedly ignored did not undermine his decision that Smith did not satisfy listing 11.05B. Under 11.05B, if an applicant suffers from any of a number of listed brain tumors,

including an oligodendroglioma, the Commissioner must make his disability determination by referring to other listings, including 12.02 (organic mental disorders). In his decision, the ALJ did not dispute that Smith suffered from an oligodendroglioma, but determined that she was not disabled because she did not meet the requirements of listing 12.02. Because she could not have been found disabled under listing 11.05B without meeting the criteria of 12.02 and the existence of her tumor was not in dispute, the ALJ did not err by failing to discuss every piece of evidence demonstrating that she suffered from a brain tumor.

With respect to listings 12.02 and 12.04, the ALJ analyzed them together because they share criteria for determining disability. The ALJ apparently assumed that Smith met subpart A of each listing and focused exclusively on whether she established that she fulfilled the criteria of subpart B of each listing. Under listings 12.02 and 12.04, a claimant is disabled if she exhibits two of the following impairments:

> 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.02B and 12.04B; *Young v. Secretary of Health and Human Services,* 957 F.2d 386, 390 (7th Cir.1992). The ALJ determined that Smith was not markedly limited in her daily activities, did not suffer difficulties in social functioning, and had not suffered "more than one or two episodes of deterioration or decompensation in work or work-like settings." Moreover, the ALJ continued, although Smith suffered from "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner," she did not suffer to the point that she could not perform simple and repetitive tasks.

With respect to the first criterion of 12.02B and 12.04B, Smith's ability to perform tasks of daily living, the ALJ found she was not "markedly impaired" because she was able to care for her personal needs, perform some household tasks, and regularly attend church and a Bible study. But his decision does not reflect whether he considered evidence showing that Smith had difficulty performing her limited daily tasks. *See* 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.00C(1) (ALJ must assess the quality of the claimant's activities by their "independence, appropriateness, effectiveness, and sustainability"); *Lewis v. Bowen,* 823 F.2d 813, 816 (4th Cir.1987) (ALJ failed to consider quality of claimant's activities). For example, she testified at the hearing that she had difficulty cooking because she could not remember recipes and had trouble following directions. Similarly, in an interview with the SSA, Smith's mother stated that Smith did things slowly, needed to be reminded to complete tasks, and was unable to use a vacuum cleaner because it caused her to have headaches. Given this evidence, which was not discussed by the ALJ, his conclusion that Smith's daily activities are not "markedly impaired"[4] does not appear to be supported by an "accurate and logi-

---

4. Under the SSA's regulations, "marked" impairment is defined as "more than moderate but less than extreme." 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.00C. The regula-

tion gives the following example: "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of

cal bridge between the evidence and the result." *See Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir.2000) (citation omitted); *Lewis,* 823 F.2d at 816. Additionally, the ALJ did not analyze *why* Smith's limited daily activities were inconsistent with her inability to perform gainful employment. The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily demonstrate that she is not disabled. *See Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir.2001); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000); 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.00C(1).

With respect to Smith's social functioning, the ALJ determined that she suffered no marked difficulties because she "has several friends at church," regularly attends church and a Bible study group, goes out to eat, and gets along "well" with other people. Again, however, the ALJ failed to analyze the quality of Smith's social contacts and her ability to function, and did not discuss in his decision evidence showing that Smith had few friends and acted inappropriately in public. For example, Smith's mother stated that Smith often became confused and irritable with cashiers, evidence that Smith's social functioning was impaired. *See Young,* 957 F.2d at 391; 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.00C(2) (impaired social functioning may be demonstrated by a history of altercations with others, including store clerks). Because the ALJ did not provide an explanation of whether he considered this evidence and, if so, why he did not credit it, it is not clear whether substantial evidence supports his decision that Smith's social functioning was not restricted. *Shramek,* 226 F.3d at 811.

With respect to whether Smith exhibited marked difficulties in maintaining concentration, persistence, or pace, the ALJ found that she had difficulties in all of these areas but "not to the extent that she would be incapable of performing simple and repetitive tasks." But while the ALJ cited evidence in support of his opinion, he did not explain why contrary evidence was not worthy of credence. For example, with respect to Smith's concentration, the ALJ focused on a report from Ingwell stating that her ability to concentrate was in the "mid range or dull normal." But he did not explain why other evidence did not contradict this conclusion, such as Smith's testimony that she had to take notes during church services because she could not concentrate on the pastor's sermons, and her mother's observation that Smith was not interested in watching television because she could not concentrate on the programs. The ALJ also did not discuss any of the evidence showing that Smith had problems in maintaining her pace. Smith testified that she tried to return to work after her brain surgery but that "it would take me just on one dictation an hour when before it would only take me maybe a couple of minutes." She also testified that she tried to help washing dishes at her church's kitchen but was asked to stop because "I wasn't moving fast enough, but that was as fast as I could move." Under the regulations the ALJ must "exercise great care" in reaching a decision about a claimant's ability to maintain concentration, persistence, and pace, and pay particular attention to the claimant's ability to perform on a sustained basis under the stresses of employment. *See* 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.00C(3). Because the ALJ's deci-

limitation is such as to interfere seriously with your ability to function independently,

appropriately, effectively, and on a sustained basis." *Id.*

sion did not analyze why he discredited evidence indicating that Smith suffered from deficiencies in concentration, persistence, and pace, we cannot evaluate whether his decision with respect to this criterion is supported by substantial evidence.

Because it is not clear whether the ALJ's decision with respect to three of the elements of listings 12.02 and 12.04 is supported by substantial evidence, this matter must be remanded so that he can further evaluate the evidence and make a new determination whether Smith was in fact disabled under the listings.

2. ALJ's Step 5 Determination

██ Smith also argues that the ALJ erroneously determined at Step 5 that there were jobs which she could perform in the national economy. Although Smith does not assert that the ALJ's determination of her RFC at step 4 was erroneous, it is not clear that substantial evidence supports the ALJ's determination that she could engage in meaningful employment. A vocational expert did testify that a number of jobs existed in the national economy that a person with Smith's disabilities could perform. But some of these jobs, such as maid and janitor, could run afoul of the ALJ's conclusion that Smith could not work around noxious fumes or respiratory irritants, such as cleaners and dust.

Furthermore, the ALJ did not explain why he discredited Smith's testimony that she suffered from fatigue and needed frequent naps, conditions which the vocational expert testified would prevent Smith from working. Because he did not articulate a basis for disregarding this testimony, it is not clear whether substantial evidence supports his decision that Smith could engage in meaningful employment. *See Zurawski*, 245 F.3d at 888 (where ALJ did not present adequate explanation for his conclusion, the court lacked a sufficient basis to sustain his credibility decision).

CONCLUSION

For the foregoing reasons, we VACATE the district court's decision affirming the denial of Smith's application for disability benefits and REMAND the case for further proceedings consistent with this order.