NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 23, 2008
Decided May 16, 2008

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

JOHN L. COFFEY, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-2148

| | |
|---|---|
| ALLEN G. STARK, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Western District of |
| | Wisconsin |
|     *v.* | |
| | No. 06-C-052-C |
| MICHAEL J. ASTRUE, | |
|     *Defendant-Appellee*. | Barbara B. Crabb, |
| | *Chief Judge*. |

**O R D E R**

Allen G. Stark applied in July 2001 for disability insurance benefits and supplemental security income payments, claiming he was unable to work because of pain and arthritis in his foot, legs, and lower back. *See* 42 U.S.C. §§ 416(I), 423(d), 1382c(3)(A). His claim was denied initially and upon reconsideration; Stark then requested a hearing before an Administrative Law Judge. The ALJ denied Stark's claim, finding that he could perform unskilled sedentary work with certain limitations. The district court concluded that the ALJ's decision is supported by substantial evidence. Stark now argues that the ALJ's findings regarding Stark's ability to work are not supported by substantial evidence. Stark also contends that the ALJ ignored evidence in the record that would support a

determination of disability due to fibromyalgia.  Because substantial evidence supports the ALJ's decision, we uphold the denial of benefits.

At the time of his benefits hearing in October 2004, Stark was 46 years old.  Stark stated in his application for benefits that he completed the 12th grade, but at his hearing he testified that he went to school only through the 11th grade.  After leaving school, Stark entered the Army in 1977 and served for less than three weeks before he was medically discharged.  His discharge was apparently caused by an ankle injury that he sustained during basic training.  After leaving the military, Stark had jobs as a janitor, agricultural laborer, lumberyard rip saw operator, construction laborer, factory worker, and barge worker, with a period of unemployment between 1990 and 1993.  Stark's janitorial duties included sweeping, mopping, taking out garbage, cleaning bathrooms, buffing floors, and washing windows and furniture.  Stark reported nearly continuous full-time employment from April 1996 until December 1999.  After that he had a few sporadic, short-term jobs which he left because of his health problems.  Stark represented in his application that he stopped working altogether in May 2001, but he testified before the ALJ that he did not work after January 1, 1999.

Stark asserted an onset date of January 1, 1999.  He stated in his application that his ability to work is limited by the following conditions: posterior tibial tendon dysfunction, characterized by pain and swelling in the ankle that can develop into flat feet, weakness, and an inability to stand on the toes; subtalar arthritis, or arthritis in the ankle bone; arthritis in the lower back; and tendonitis in both legs.  Stark asserted that he was unable to sit, stand, walk, or lift items for more than 10 minutes at a time.

Unless otherwise noted, all of the medical evidence is drawn from treatment records rather than live testimony.  In December 1998 Stark began to seek care at the Veterans Administration Medial Center in Tomah, Wisconsin, complaining of chronic problems with his right ankle.  Dr. Dale Wicklund examined him and surmised that the ankle problems, which included pain, swelling, and abnormal gait, could be related to the injury Stark had sustained in the Army.  Wicklund also noted degenerative changes in other joints and prescribed Ibuprofen as well as an orthopedic consultation.  Stark apparently did not seek treatment again until October 1999, when he was seen by Dr. Maynard K. Pang at the VA. Pang noted that Stark was still experiencing ankle pain and swelling and walked with a limp.  Pang observed that this could be due to a hairline fracture or damage to the cartilage and instructed Stark to consult the orthopedic clinic and use crutches until told otherwise. He prescribed Percocet for pain management.

Stark saw Dr. Michael D. Lamson at the orthopedic clinic later that same month. Stark explained to Lamson that he had sustained an ankle injury during basic military

training and had been experiencing pain ever since. Lamson observed tenderness along the length of Stark's tibial tendon and pain with ankle movement. He noted that Stark was unable to complete a single heel raise and had a limited range of motion through his right ankle. Lamson could not make a definitive diagnosis of the cause of the pain and therefore ordered a CT scan and also instructed Stark to get a UCBL (University of California Biomechanics Laboratory) shoe insert.

The following month, November 1999, Stark returned to the VA after he fell off the roof at work that morning, hitting his head, right hand, and elbow. Dr. Myrna I. Munoz examined Stark and learned that he had consumed five to six mixed drinks plus five to six beers the previous night. Stark reported extreme pain. Munoz observed swelling and bruising in various areas. She gave Stark pain medication and a sling and a splint for a probable fracture in his hand.

A few days later, Stark returned to the orthopedic clinic and again saw Dr. Lamson. Lamson noted that Stark had been "ambulating without difficulty" and placed his fractured hand in a cast. Lamson also noted that Stark had not gotten the shoe insert. In February 2000 Stark visited the VA again. Dr. Wicklund concluded that Stark's "only problem is his ankle injury which he sustained during basic training." Wicklund observed that Stark was limping, causing other joints to ache.

Then in March 2000 Stark saw a physical therapist, Abdurahman Omar, who recorded that Stark was experiencing "severe" foot and ankle pain that was interfering with his sleep. Omar prescribed use of a short-leg walking boot for four weeks and a gait aid if needed.

In May 2000 Stark called the orthopedic clinic and spoke with a nurse, Caryn Grady, about pain and swelling in his ankle and difficulty walking. Stark then returned to Dr. Wicklund in August 2000. Wicklund reaffirmed that the major diagnosis he was following was "chronic ankle pain." Wicklund concluded that Stark's old injury was now affecting his lower back and knee because of his limping. Wicklund prescribed continuing Stark on his pain medications.

In February 2001 Stark sought the advice of Dr. Boyd C. Lumsden at the orthopedic clinic. Lumsden recorded in his progress notes Stark's history of worsening right ankle pain, which Lumsden attributed to his military injury that was never properly treated. Lumsden noted that the injury was "significantly impacting" Stark's daily life and that he had recently quit a factory job (this was two years after, according to his hearing testimony, Stark had stopped working) because he was unable to tolerate prolonged standing. Lumsden's examination revealed that Stark was unable to perform heel raises on the right

side and could not toe walk at all. Lumsden identified tenderness, diminished range of motion, and significant pain. After examining X-rays and CT scan results, Lumsden observed evidence of arthritis, deformity, and an old fracture. Lumsden discussed the UCBL shoe insert again with Stark, who reportedly thought that it would not help. Lumsden also suggested surgery, but Stark was not interested. Lumsden counseled that Stark was not going to get better unless he agreed to pursue one of these two options. Lumsden told Stark that it was his opinion that Stark's problems "could, in fact, be related to a previous service injury, although I do not feel it would be related to any other more systemic complaints and that this is strictly an ankle injury not related to back pain or any other problems."

The next month, Stark returned to Omar, the physical therapist, in order to get fitted for an orthotic that would support his ankle and foot. In April, Stark met Dr. Brian E. Koch for a follow-up orthopedic appointment. Stark told him that the orthotic made his foot feel better at times, but for the most part did not seem to fit him well and caused discomfort. Koch noted that Stark again said he was not interested in surgery. Koch recommended trying a new orthotic that would fit him better, but there is no indication in the record that Stark followed up on Koch's advice.

Stark continued to experience problems using the orthotic, and by July 2001 he had stopped using it. At that time he saw nurse Sue Ellen Eugster at the orthopedic clinic for a follow-up appointment. Eugster summarized Stark's history, noting that his Army injury apparently contributed to his ongoing ankle pain. Eugster noted that Stark's condition was essentially unchanged from recent evaluations. Her impression was that Stark suffered from a bilateral foot deformity with posterior tibial tendon dysfunction and subtalar degenerative joint disease. However, Eugster noted that she was "concerned about his multiple MS [musculoskeletal] complaints and wonder if he may have a more systemic process occuring [sic] /possibly fibromyalgia." She thought a referral to the rheumatology clinic could be helpful. This is the first mention of fibromyalgia in the record.

The following month (with his disability application now pending) Stark saw Dr. Wicklund for an annual preventative health screening and reported "shooting pain" from his right ankle up into his knee, as well as aching back, joints, and muscles. Stark said he had been bitten by a tick four times the previous spring. Wicklund noted that Stark had been turning to alcohol to manage his pain because Ibuprofen was not helping. Wicklund assessed Stark's condition as "chronic pain syndrome, with degenerative disease in the ankle." Wicklund ordered a test for Lyme disease as well as a new pain medication.

In October 2001 Dr. Pat Chan, a state disability agency consulting physician, completed an assessment of Stark's residual functional capacity. Chan diagnosed ankle

degenerative joint disease, noting that this likely resulted from Stark's military injury.  He concluded that Stark could lift and carry 10 pounds occasionally and less than 10 pounds frequently and could stand or walk or both for a total of two hours and sit for a total of six hours in an eight-hour workday.  This form was reviewed and signed without changes by another state disability agency consulting physician, Dr. Robert Callear, in April 2002.

Stark visited the VA rheumatology clinic in October 2001 and met with Dr. Eric C. Gowing.  Gowing noted Stark's history of ankle and lower back pain and ordered X-rays, which turned out to be normal.  At a follow-up visit, Gowing observed diffuse tenderness in Stark's right ankle and ordered a chest X-ray and other laboratory tests to diagnose Stark's musculoskeletal complaints.  In December Stark underwent magnetic resonance imaging of his right foot and ankle, which showed severe degenerative changes in the middle facet of the ankle joint, but that the ligament structure and soft tissues were normal.  During a follow-up visit in January 2002, Gowing noted that Stark had still not scheduled the X-rays and other tests he had ordered the previous fall.  Gowing explained to Stark that he still did not have a diagnosis for his musculoskeletal complaints and that Stark had to undergo the required tests.  During a visit later the same month, Stark tested positive for Lyme disease and also reported pain in his wrists, elbows, knees, hips, and ankles with prolonged morning stiffness.  Gowing noted that Stark's Lyme disease had been active for a prolonged period, approximately nine months, and that some of his "symptoms may be related to fibromyalgia which is associated with Lyme disease and may not respond to treatment with" his prescribed medication.

In July 2002 Stark was examined by a resident, Julie Hildebrand, in the rheumatology clinic.  By then his application for benefits had been denied initially and on reconsideration.  Hildebrand noted that Stark continued to experience debilitating pain and fatigue despite treatment.  He complained of swelling and pain in his right ankle and lower back pain, but no longer any stiffness.  Stark gave her a form to fill out related to his application for social security benefits; Hildebrand did not complete the form because it "relate[d] to rheumatoid arthritis, a disease which the patient does not have" and instead answered the appropriate questions in her progress notes.  Hildebrand diagnosed a history of Lyme disease, which had been treated, and severe degenerative arthritis of the ankles and lumbar spine, and predicted that Stark would "likely not recover function from his current state."  She stated that Stark's pain and fatigue would interfere with his attention and concentration to perform even simple work tasks on a daily basis for two to three hours. She suggested the following work restrictions: no walking; sit 30 minutes then must stand; stand 30 minutes then must sit; sit and stand for a total of about two hours in an eight-hour work day; slight elevation of legs with prolonged sitting; unscheduled breaks of 15 minutes; use of a cane; lift less than 10 pounds occasionally and never 10 pounds or more; and never twist, bend, or stoop.  Finally, Hildebrand noted that some of Stark's symptoms "may be

related to fibromyalgia which is associated with Lyme disease (fatigue)." The administrative record does not show that Stark sought any further treatment for his physical symptoms before his hearing before an ALJ in 2004.

In early 2003 Stark was charged with battery and bail jumping, related to troubles with his girlfriend. He was placed in Mendota Mental Health Institute from March 2003 until August 2003 for treatment to attain competency. Stark was ultimately found competent, convicted, incarcerated, and released in February 2004. During his stay in Mendota, Stark was evaluated and treated for depression, mood swings, and paranoia. Because Stark does not now argue that he has a disabling mental condition, his mental health assessments have no bearing on his present claim for social security benefits, except for one surprising feature: they reveal that Stark played volleyball with the other residents of Mendota. Records from March 2003 indicate that Stark's flat affect became brighter when he was involved in activities that he enjoyed, including "volleyball, gross motor activities." A record from May 2003 states that Stark demonstrated "a competitive edge in all-unit volleyball when he got angry at his peers who would miss the ball."

In October 2004 the ALJ conducted Stark's hearing. Stark testified, along with Allen Hauer, Ph.D., an impartial medical expert, and Richard Willette, an impartial vocational expert. Stark told the ALJ that he lived with his mother who did most of the cooking and cleaning, with hired help. Stark also reported that he could drive a car only for 20 to 25 minutes due to his ankle condition. Stark agreed that he could sit for 30 minutes at one time and then needed to stand, and likewise that he could stand for 30 minutes and then need to sit. Stark, however, said that he could sit, stand, or walk for less than two hours in an eight-hour workday because the pain in his legs, ankle, and back had increased since he applied for benefits. Stark agreed that he would need to take unscheduled 15-minute breaks during a workday. Stark agreed that he could lift less than 10 pounds occasionally but said that he would need to elevate his legs for more than half of the workday because his pain had gotten worse.

It appears that after Stark's application for benefits was denied on reconsideration, he added a new claim for benefits on the basis of mental impairment, but the record is unclear on this point because a copy of Stark's request for an administrative hearing was not included in the record. Dr. Hauer testified, therefore, regarding Stark's history of mental illness and applied listing of impairments 12.04, 12.08, and 12.09 for mental disorders. Dr. Willette testified regarding Stark's previous work as a janitor and factory worker and said that he had no transferable skills. Willette testified that the following jobs in Wisconsin would fit within the limitations of sedentary work with a sit-stand option and limited contact with the public: sedentary assembler (6,000); production inspector, checker, and examiner (1,000); sedentary hand packager (150); and general office helper (6,000). In

response to the ALJ's inquiry, Willette testified that these jobs corresponded to the definitions in the Dictionary of Occupational Titles (DOT). Stark's attorney asked Willette to assume the following hypothetical: a person who is able to sit for only 30 minutes at a time, then must stand; stand for only 30 minutes at a time, then must sit; sit, stand, or walk for a total of two hours in an eight-hour workday; needs daily unscheduled breaks of 15 minutes; after prolonged sitting, must elevate his legs six inches; and in a sedentary job, must elevate his legs 50% of the time. Willette testified that such a person would not be able to perform any of the previously identified jobs because anything beyond two 15-minute breaks and a half-hour lunch break would not be permitted.

The ALJ denied Stark's claim, finding that although Stark could no longer perform any of his past work, he could still perform unskilled sedentary work with limited contact with the public or supervisors and with the ability to change sit/stand positions as needed. The ALJ analyzed Stark's claim using the five-step process laid out in 20 C.F.R. §§ 404.1520, 416.920. Because Stark had possibly engaged in substantial gainful activity after his alleged onset date, the ALJ reserved ruling on step one. The ALJ also concluded that Stark did have severe impairments: degenerative joint disease of the right ankle, some degenerative changes predominating at L2-3, affective disorders, personality disorders, and a history of drug or alcohol abuse or both in possible current remission. However, the ALJ concluded that none of these conditions met any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1, Regulation No. 4.

At step four, the ALJ determined Stark's residual functional capacity, considering both Stark's subjective complaints as well as the medical record. In making these findings, the ALJ placed great weight on the agency medical consultants, Drs. Chan and Callear, and less weight on Dr. Hildebrand's report on Stark's limitations. The ALJ noted that Hildebrand relied heavily on Stark's subjective report of symptoms and limitations and seemed to uncritically accept what he said as true. The ALJ observed that Stark consulted medical resident Hildebrand not for the sake of treatment but in order to obtain a social security benefits report. The ALJ also concluded that Stark was exaggerating his physical limitations when he saw Hildebrand, since the rest of the medical record does not support her more extreme conclusions and, in fact, he was able to play volleyball not long after. The ALJ noted other grounds for doubting Stark's credibility, including his inconsistent information about how much school he completed, his history of criminal conduct and incarceration, his testimony that he had not worked since January 1, 1999, and reports of possible malingering at various points in the medical record. The ALJ also apparently did not believe Stark's account of dramatically worsening pain, stating instead that Stark's symptoms had been present before his alleged disability onset date, and he was still able to work at that time. The ALJ further observed that Stark had not received the type of medical treatment a totally disabled individual would be expected to require; for example, there

were significant gaps in Stark's medical history and evidence of his failure to follow-up on recommended treatments.

The ALJ concluded that Stark lacked the ability to perform his past relevant work, and noted that the burden shifted to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that he could perform. The ALJ adopted the vocational expert's testimony regarding work that was available to Stark.

On appeal Stark first challenges the ALJ's findings regarding the availability of work that he is qualified for and capable of performing. Stark contends that the testimony of vocational expert Willette was so inadequate that the ALJ's decision, which relied on it, is not based on substantial evidence. Stark asserts that the jobs Willette listed are "not specific occupations but broad categories" and do not reflect the specific occupations listed in the DOT. Stark contends that it is not enough for an ALJ to ask a vocational expert whether his testimony corresponds to the DOT; even if an ALJ receives an affirmative response, according to Stark, the ALJ should investigate and resolve any "apparent conflicts," such as the one that, he argues, is presented in this case.

SSR 00-4p requires an ALJ to ask a vocational expert about any possible conflicts between his testimony and the DOT and to elicit reasonable responses for any discrepancy. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). Stark acknowledges that the ALJ satisfied the first component of this ruling by asking Willette whether his testimony corresponded to DOT definitions. Stark contends that, even though Willette stated that his testimony was consistent with the DOT, the ALJ should have inquired further into specific characteristics of the jobs Willette listed. We have never held that ALJs have any such further requirement. Instead, we stated in *Prochaska* that if the VE's evidence "appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict." *Id.* Willette's testimony does not present any apparent conflict with the DOT, and so the ALJ had no reason to doubt his assurance that the jobs he described corresponded to the DOT definitions. It was only after the hearing that Stark asserted that there was a potential conflict between Willette's testimony and the DOT definitions. Although Stark's attorney took the opportunity to ask Willette a hypothetical after his testimony, Stark's attorney did not conduct any further cross-examination. For example, Stark's attorney did not ask Willette to explain the job requirements in more detail or ask the ALJ to keep the record open so that he could cross-check the jobs Willette identified with the DOT. *See Britton v. Astrue*, No. 07-1547, 2008 U.S. App. LEXIS 7659, at *11 (7th Cir. Apr. 10, 2008) (maintaining that VE's "bottom line" must be "available on demand"). Absent any apparent conflict, the ALJ satisfied his duty when examining the vocational expert. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("[A]n expert is free to give a bottom

line, provided that the underlying data and reasoning are available on demand."); *Powers v. Apfel*, 207 F.3d 431, 436-37 (7th Cir. 2000) (stating that ALJ is permitted to rely on expert testimony even if it contradicts DOT). Although Stark insists that Willette's testimony presents a conflict with the DOT, his brief fails to elucidate any such conflict. Therefore, there was no error in the ALJ's reliance on Willette's testimony.

Next Stark argues that the ALJ erred by not discussing Stark's alleged fibromyalgia and related functional limitations. Stark asserts that he tested positive for Lyme disease and that two physicians noted in the record that there could be a possible link to fibromyalgia.

We will not overturn the ALJ's determination in a Social Security case if it is supported by substantial evidence. *Schmidt v. Astrue*, 496 F.3d 833, 841-42 (7th Cir. 2007). The ALJ need not address every piece of evidence in the record—it is enough to "build a bridge" from the evidence to the conclusion. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). It is especially hard to succeed in arguing that the ALJ failed to properly weigh evidence because we may not substitute our own judgment for the ALJ's on matters of credibility, weight of evidence, or conflicting evidence. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). ALJs, however, may not substitute themselves for doctors and may not make medical determinations. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992).

Stark did not claim fibromyalgia in his disability application, nor did he raise the condition in his request for reconsideration or at his hearing. Despite Stark's assertions to the contrary, fibromyalgia was never conclusively established by any health-care provider who examined Stark. And even given that there was some evidence, however sparse, of fibromyalgia in the record, the ALJ considered all of the relevant evidence in his decision and did not ignore Stark's musculoskeletal complaints. The ALJ quoted, for example, Nurse Eugster's comment that fibromyalgia was a possibility and also addressed Stark's Lyme disease. The ALJ's passing reference to the possibility of fibromyalgia accurately reflects the limited references to this condition in the record. Moreover, the record states that Stark's Lyme disease had been treated; therefore, the ALJ's decision not to discuss it as a continuing limitation was supported by substantial evidence. The ALJ fully recognized the diagnoses that are supported in the record when he determined that Stark was only capable of performing sedentary work with limitations.

AFFIRMED.